Bennett P. SMITH, Plaintiff-Appellant,

v.

XEROX CORPORATION,
Defendant-Appellee.

No. 87-3853.

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1989.

David J. L'Hoste, Rockne L. Moseley, Lea & Gibbens, New Orleans, La., for plaintiff-appellant.

Thomas G. Buck, Blue, Williams & Buckley, Metairie, La., for defendant-appellee.

Charles A. Boggs, Thomas W. Lewis, New Orleans, La., for Loral Electro Optical.

Before JOHNSON, JOLLY and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case we are called upon to consider whether the district court properly granted summary judgment in favor of Xerox Corporation, in a tort suit against it for personal injuries arising from the malfunctioning and premature discharge of a weapon simulator used during military training exercises, on the grounds that Xerox is entitled to the affirmative defense of government contractor immunity. Holding that Xerox presented evidence supporting its claim to the defense of government contractor immunity, and that Smith failed to raise any genuine issue of material fact regarding the defense, we affirm the summary judgment in favor of Xerox.

## I

On November 16, 1983, P.F.C. Bennett Smith, was severely injured during military training exercises at Fort Polk, Louisiana, when an explosive cartridge in a shoulder-mounted "VIPER" weapon simulator he was using exploded prematurely, burning his arm and upper chest. The VIPER simulator was designed to fire a beam of laser light at light sensitive targets and had an explosive cartridge which simulated the noise, fire and smoke produced by an actual anti-tank weapon. When Smith moved the safety catch on the VIPER into the "arm" position, the VIPER discharged without Smith's having pulled the trigger. Smith was caught in the weapon's back blast.

Smith brought suit for his personal injuries against Xerox, the manufacturer of the weapon, and Loral Electro Optical Systems, Inc., the company under contract with the United States Army to repair VIPER units. His allegations against Xerox included negligence in the design and/or manufacture of the weapon; strict liability for injuries caused by a weapon unreasonably dangerous for its normal use; failure to warn or instruct Smith regarding the possibility of the weapon's firing when armed, when Xerox had knowledge that the weapon had malfunctioned in a similar manner previously; and breach of warranty of fitness for intended use. Smith also pled the doctrine of *res ipsa loquitur* on his negligence claims.

On October 16, 1987, Xerox filed a motion for summary judgment arguing that Smith's claims be dismissed as a matter of law, on the grounds that even if Smith could show a design or manufacturing defect, Xerox was entitled to summary judgment on its assertion of the government contractor's immunity defense. The district court granted the motion, and from that judgment Smith now appeals.

## II

The Supreme Court recently settled a division among the circuits as to the proper formulation of the government contractor defense in *Boyle v. United Technologies Corp.*, —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), holding that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law,

when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." 108 S.Ct. at 2518. *Boyle* further held that the government contractor defense applies to both negligence and strict liability actions, as well as to other state law tort claims.

Although *Boyle* was decided after the district court considered this case and after the case was initially briefed to this court, we note that this circuit's previous application of the government contractor defense employed essentially the same standard as we now apply under *Boyle.*

Prior to *Boyle,* this circuit in *Bynum v. F.M.C. Corp.,* 770 F.2d 556 (5th Cir.1985) had adopted the Ninth Circuit's formulation of the defense set forth in *McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.1983). *Boyle* adopted three of the four prongs of *McKay*'s test, rejecting *McKay*'s first requirement that the plaintiff must be otherwise precluded from suing the government under the *Feres* doctrine because such a requirement would produce "results that are in some respects too broad and in some respects too narrow." *Boyle* further simplified *McKay*'s second requirement to require that the United States have "approved" rather "established, or approved" reasonably precise specifications for the military equipment alleged to be defective. *Boyle* 108 S.Ct. at 2517, 2518. The Fifth Circuit formulation of the government contractor defense patterned on *McKay,* set forth in *Bynum* and applied by the district court in this case, is therefore materially the same as the standard now definitively established by the Supreme Court in *Boyle.*

### III

"[S]ummary judgment is proper when, viewed in the light most favorable to the non-moving party, 'the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Bynum v. F.M.C. Corp.,* 770 F.2d 556, 576 (5th Cir. 1985); Fed.R.Civ.P. 56(c). Should the moving party carry its burden of showing the absence of a genuine issue of material fact, the burden shifts to the party opposing the motion to demonstrate through affidavits or other competent evidence that a genuine issue of material fact exists for trial. *Bynum,* 770 F.2d at 576. "Mere allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are not enough." *Id.;* Fed.R.Civ.P. 56(e).

On appeal, Smith contends that Xerox failed to satisfy its burden of proving the affirmative defense of government contractor immunity. First, Smith argues, Xerox failed to establish affirmatively that the government had approved reasonably precise specifications ·for the VIPER because the original specifications were never produced; Xerox only produced a set of modified specifications dated February 1985, over a year after Smith's accident. Second, Xerox supplied no evidence that the particular VIPER unit in question had been examined for defects, other than the general statement of a Xerox witness that Xerox produced all its weapons in accordance with specifications. Smith also argues that Xerox had reason to know that the VIPER might misfire in damp conditions and yet failed to inform the government of this possibility, which now precludes Xerox from taking advantage of the government contractor defense.

### A.

First we consider whether Xerox sufficiently demonstrated that the government approved reasonably precise specifications for the VIPER simulator. Because *Boyle* itself gives little guidance on what constitutes "reasonably precise" specifications, it is instructive to consult pre-*Boyle* cases construing the same language.

In *McKay,* the Ninth Circuit remanded to the district court for a determination of whether the United States had set or approved reasonably detailed specifications for an aircraft ejection system in the face

of contradictory allegations by the appellants and appellees. The court of appeals was unable from the record before it to make that determination itself with assurance, but said that "if the United States neither set specifications for the system (other than general outlines of what type of system it required) nor approved [the contractor's] final reasonably detailed specifications (by examining and agreeing to a detailed description of the workings of the system)" then the contractor would be subject to strict liability for the design defect. 704 F.2d at 453.

In the Fourth Circuit's *Boyle* opinion, 792 F.2d 413 (4th Cir.1986), *vacated and remanded,* —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the court found that a contractor had adequately demonstrated that the Navy had approved reasonably precise specifications for a helicopter escape hatch where Sikorsky, the helicopter manufacturer, and the Navy worked together to prepare detailed specifications; one of Sikorsky's program engineering managers for the helicopter "described in some detail the back-and-forth discussions" between Sikorsky and the Navy; Sikorsky built a mock-up of the helicopter cockpit, including the collective stick and the emergency escape hatch; and the Navy reviewed the mock-up and approved the design. 792 F.2d at 414–15.

Smith complains that Xerox failed to produce reasonably precise specifications for the VIPER's waterproofing procedures. He argues that because they were not produced, this court cannot determine if such procedures were in fact reasonably precise, approved, or ever followed.

Although Xerox failed to produce complete specifications for the original VIPERS it manufactured, Xerox did produce a listing of those specifications, as well as a copy of the original government performance criteria dictating the environmental specifications the government wanted the VIPER to meet in terms of temperature, humidity and salt resistance, and a production contract furnished by Xerox for a series of VIPERS containing specific reference to government-approved specifications. Further, Lawrence Gallagher, an employee of Xerox from approximately 1975 to 1983 who was involved with the development of the VIPER system, testified at his deposition that the Army reviewed and approved the drawings and specifications prepared by Xerox. The government contractor defense requires only that the government approve *reasonably* precise specifications. Because the government in this case supplied the relevant environmental specifications it wanted the VIPER to meet, which were incorporated into Xerox's production contract, and Gallagher's unrebutted deposition testimony was that the government reviewed and approved Xerox's final drawings and specifications for the VIPER, we find that Xerox has satisfied its burden of proof on this issue.

### B.

There was also sufficient evidence in the record from which the district court could find that Xerox had satisfied its burden of proof on the second element of the government contractor defense, that the VIPER conformed to its specifications.

In the Fourth Circuit's decision in *Boyle,* on the question of whether the helicopter at issue had conformed to its specifications, the Fourth Circuit noted that after Sikorsky built the helicopter, the Navy accepted it as fully complying with specifications and had had thirteen years of experience with it by the time of Boyle's crash. The court held that Sikorsky had satisfied that requirement of the military contractor defense. 792 F.2d at 414–15. In this case, Gallagher testified for Xerox at his deposition that inspectors were present on the assembly line. He also testified that every single device produced was given a functional test. Gallagher testified that if the VIPER had not passed inspection, it would not be in use, and from what he knew, the VIPER had worked without problems for years.

The plaintiff in this case was simply unable to adduce any evidence to show that this VIPER was not made in accordance with its specifications. Although the VIPER misfired again when a colonel tested it in the field immediately after it injured

Smith, it was taken that same afternoon directly to the Loral maintenance shop. There Loral technicians conducted various tests but were unable to duplicate the problem. The VIPER was then sent to factory engineers in California for further testing and was returned to Loral with instructions to reassemble. The VIPER was reassembled and returned to service on May 7, 1984. In the absence of any evidence adduced by Smith tending to show that the VIPER had a manufacturing defect, and in the light of the government's acceptance and extended use of the VIPER and Gallagher's testimony that all units were inspected and tested, we find that the district court properly granted summary judgment in favor of Xerox on the second prong of the *Boyle* test.

### C.

Smith argues that Xerox had notice that the VIPER might misfire under humid conditions because it had modified another system, the CHAPPARAL, to prevent similar misfirings. Because Xerox failed to convey this information to the government, it may not rely on the government contractor defense to escape liability for accidents resulting from the VIPER's defective design.

■ We agree with the district court that the VIPER differed significantly from the CHAPPARAL and therefore knowledge that the VIPER might be susceptible to a misfiring from moisture could not be imputed to Xerox from problems Xerox had had with the CHAPPARAL. The CHAPPARAL was always intended to be stored outside, but was originally designed in such a fashion that it literally filled with water when it rained. When Xerox learned of a misfire of the CHAPPARAL associated with rain collecting in the CHAPPARAL housing, it redesigned the system, putting in drain holes to prevent water from collecting, and altering the CHAPPARAL's printed circuit board so that a more powerful charge would be required to make the device fire and the system would be less susceptible to low current short circuits. In contrast to the CHAPPARAL system, the VIPER was never intended to be stored outside where it would be directly exposed to the elements. The VIPER's firing mechanism is located inside a tube, and VIPERs are stored in transit cases when not in use to protect them from contact with rain, snow and mud.

■ Smith also argues that Xerox has experienced other moisture-related problems with the VIPER system. The record shows from the deposition testimony of Steven Walker, an eyewitness to Smith's accident, that immediately after Smith's accident a colonel tested the weapon in the field and the VIPER misfired again. This incident, however, has no bearing on Xerox's actual knowledge of the VIPER's defective condition prior to Smith's accident. Although there was considerable hearsay evidence of similar accidents occurring in other military units, these incidents were never verified. Gallagher testified that Smith's accident was the first he had heard of the VIPER system's firing when in the armed position. Even if similar accidents had occurred, because the government must receive accident reports it is difficult to see how it can be said from such incidents that Xerox at any time had information about dangers in the use of the equipment known to the supplier, but not known to the United States. Smith's own witness from Loral testified that at the time the VIPER was produced, there would have been no reason to know of any danger in using the VIPER in high moisture conditions that would have warranted additional weatherproofing beyond that required to meet the environmental specifications provided by the government, because there was then no reason to know that corrosion might cause the VIPER to fire when the pull-to-arm switch was activated.

For these reasons Smith has failed to raise a genuine issue of material fact on this element of Xerox's affirmative defense of government contractor immunity.

### IV

Smith concedes, in his supplemental brief filed after the Supreme Court opinion in *Boyle* was rendered, that his state law

breach of warranty claim cannot stand after *Boyle.*

## V

Smith also appeals the district court's determination that Smith would not be entitled to assert the doctrine of *res ipsa loquitur* if the case were to proceed to trial.

■ Although it is true that the applicability of the *res ipsa loquitur* doctrine must generally be determined after evidence has been heard at trial, *Sabella v. Baton Rouge General Hospital,* 408 So.2d 382, 383 (La.App.1981), in order for the *res ipsa loquitur* rule of circumstantial evidence to apply, (1) the circumstances surrounding the accident must create a presumption of negligence on the part of the defendant; (2) control and management of the instrumentality which caused the accident must have been vested exclusively in the defendant; and (3) the plaintiff's position must be such that he is unable to obtain information regarding the cause of the accident. *Campbell v. Otis Elevator Co.,* 808 F.2d 429, 432 (5th Cir.1987). The district court found that Smith would not be entitled to invoke the doctrine of *res ipsa loquitur* because Smith could not prove that Xerox and Loral jointly, or one or the other of them individually, had been in exclusive control of the VIPER. Xerox manufactured the VIPER, the Army subsequently exercised control over the weapon, and it came into the custody of Loral only for repairs.

Smith cites *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422, 430 (5th Cir.1977), for the proposition that the doctrine of *res ipsa loquitur* does not require him to exclude all possible alternative causes of his injury, but only requires that he establish by a preponderance of the evidence that the negligence of Xerox and/or Loral as opposed to the negligent acts of other parties was the probable cause of his accident. Smith argues that *res ipsa* should not be rejected as a means of proving Xerox's negligence simply because it is possible that the Army's negligence may have factored into the accident. *See Higginbotham* at 430. We disagree.

■ In *Higginbotham,* this circuit stated that "[e]very possible alternative cause of the injury need not be totally excluded for *res ipsa* to apply; all that is necessary is that the likelihood of other causes be sufficiently reduced so that the factfinder may reasonably conclude from a preponderance of the evidence that the fault, if any, is attributable to the party against whom the doctrine is employed." *Id.* However, *res ipsa loquitur* cannot be applied to a group of defendants unless that group includes all whose fault might have caused the injury. *Winans v. Rockwell International Corp.,* 705 F.2d 1449, 1455 (5th Cir.1983). Were not the government immune from liability under the *Feres–Stencel* doctrine, the Army would be charged as a defendant in this case. *See Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950) (holding that the United States retains sovereign immunity for personal injuries incurred by servicemen in the course of service); *Stencel Aero Engineering Corp v. United States,* 431 U.S. 666, 673, 97 S.Ct. 2054, 2058–59, 52 L.Ed.2d 665 (1977) (holding the government immune from indemnity claims by manufacturers for obligations arising from servicemen's injuries). Because Smith bears the burden of proving "freedom of fault on the part of all through whose hands the instrumentality passed after it left the defendant," *Winans,* 705 F.2d at 1455, and the possibility has not been excluded that the Army's own negligent care of the weapon contributed to Smith's accident, *res ipsa loquitur* cannot apply to a claim against Xerox and Loral as joint defendants. The VIPER passed from Xerox to the Army to Loral, and Smith could not prove that the Army was not negligent; therefore Xerox and Loral cannot be held as joint tort-feasors under the rule of *res ipsa loquitur. See Winans,* 705 F.2d at 1455.

■ Nor could a reasonable jury find, from the record evidence, that it was more probable than not that Smith's injury resulted from Xerox's negligence alone under the *res ipsa loquitur* doctrine. The partic-

ular VIPER at issue had been in service for a number of years after its design and manufacture by Xerox, without prior mishap.

■■■■■ Finally, *res ipsa loquitur* is not applicable in Louisiana unless the likelihood of fault by the injured party is negated. Because it is uncontested that Smith was improperly positioned when he switched the "arming lever" into the armed position, Smith cannot show that his own error did not contribute to his injury from the VIPER back blast. *Winans*, 705 F.2d at 1455. The district court's determination that Smith could not invoke the doctrine of *res ipsa loquitur* were the case to go to trial was therefore proper.

## VI

For the foregoing reasons, the decision of the district court granting Xerox summary judgment on all claims is

AFFIRMED.