Ritch, Adm. v. A M Gen. Corp.          CV-93-451-SD  03/28/96 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


<u>Manton Ritch, as Administrator</u>
 <u>of the Estate of Todd Ritch</u>


          v.                                    Civil No. 93-451-SD


<u>A M General Corporation</u>



                         O R D E R


     Manton Ritch, administrator of the estate of Todd Ritch,

brings this wrongful death action against A M General

Corporation, the manufacturer of a vehicle in which plaintiff's

decedent was a passenger while on active duty with the National

Guard in Saudi Arabia.  The complaint contains two counts,

sounding in strict liability and negligence, both premised on the

defendant's alleged inadequate warnings regarding the vehicle's

safety.

     Presently before the court are (1) defendant's motion for

summary judgment (document 13) based on the government contractor

defense, to which plaintiff objects, and (2) plaintiff's cross-

motion for summary judgment (document 22) striking the government

contractor defense, to which defendant objects.

<u>Background</u>

On February 20, 1991, Todd Ritch was killed in the desert of Saudi Arabia while a passenger in a vehicle known as a M998 HMMWV, also known as a "Hummer" or "Humvee". Amended Complaint ¶¶ 8, 9; Defendant's Memorandum at 1. Ritch, a member of the New Hampshire Army National Guard, was on active duty in Operation Desert Storm at the time. Amended Complaint ¶ 7.

The driver of the Humvee and Ritch were discovered at the accident scene beneath the vehicle, which had overturned. Army Investigative File (attached as Exhibit J to Defendant's Memorandum); Statement by Dr. Jay Brodie (attached as Exhibit 1 to Plaintiff's Memorandum). Ritch's chest was pinned under the passenger door of the vehicle. Brodie Statement. The Humvee's roll-over protective devices, referred to by the parties as A and B pillars, were apparently not in place at the time of the accident. Plaintiff's Memorandum at 3; Defendant's Memorandum at 3. The A pillar is the windshield frame; the B pillar is a multi-piece bar assembled in several sections and bolted to the vehicle. <u>Id.</u> Plaintiff's theory of the case is that Ritch's death could have been avoided had the defendant provided a warning against operating the vehicle without first securing the roll-over structures. Amended Complaint ¶¶ 20, 25.

2

The Humvee's lineage can be traced back to July of 1979, when the Army, through the Tank & Automotive Command (TACOM) first solicited private industry to develop and sell to the Army a high mobility multi-purpose wheeled vehicle.  Affidavit of Robert J. Gula ¶ 3, dated July 28, 1995 ("Gula 1 Aff.") (attached as Exhibit 1 to Defendant's Memorandum in Support of Motion for Summary Judgment).  From the initial phase of the project, when the government first accepted bids to build prototypes of the vehicle, through the last stages of development, the government provided A M General with detailed specifications for the manufacture of the Humvee.  Affidavit of John D. Weaver ¶¶ 2, 3 ("Weaver Aff.") (attached as Exhibit H to Defendant's Memorandum); Affidavit of Robert J. Gula, dated July 12, 1995, ¶ 2 ("Gula 2 Aff.") (attached as Exhibit AA to Defendant's Memorandum).  The specifications included safety features such as the roll-over protection devices.  Gula 2 Aff. ¶¶ 14, 15.  The government's specifications also indirectly affected the design of safety features.  For example, to comply with the Army's packaging and shipping restrictions, the B pillar was designed to be removed during shipment.  Id.; Gula 1 Aff. ¶¶ 14, 15.

Through periodic tests and inspections, the Army continuously monitored the manufacture of the Humvee to determine whether the vehicle conformed to such specifications.  Weaver

3

Aff. ¶ 3; Gula 2 Aff. ¶¶ 2, 16. For example, in phase one of the project, prototype development contracts were awarded to three manufacturers, including A M General; the prototype vehicles were then tested to determine whether they conformed to government specifications. Gula 2 Aff. ¶ 2.

Before A M General was awarded the production contract, the government and all bidders, including A M General, participated in a question and answer period entitled Errors, Omissions and Clarifications (EOCs). Gula 1 Aff. ¶ 7. The government asked A M General about whether its proposed vehicle would provide "suitable roll over protection." Id. In response, A M General stated that the roll-over protection of the Humvee would be superior to that of other vehicles and that, in any event, the vehicle would meet federal regulations regarding safety standards for motor vehicles. Id. at ¶¶ 8, 9. A M General further provided TACOM with detailed diagrams of the pillar system and a proposal for how A M General expected to meet the roll-over protection requirement. Id. at ¶ 10.

A M General was subsequently awarded the production contract. Id. at ¶ 6. The next phase of the project involved final acceptance and approval by the Army of the vehicle. Id. at ¶ 10. During such phase, the government performed tests and

4

inspections designed to evaluate the production vehicles against the requirements of the contract.  <u>Id.</u>

Discussion

<u>1.  Summary Judgment Standard</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; <u>Lehman v. Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 327 (1st Cir. 1996).  Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  <u>Stone & Michaud Ins., Inc. v. Bank Five for Savings</u>, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." <u>Celotex Corp. v. Catrett,</u>, 477 U.S. 317, 322-23 (1986).  It is not sufficient to "'rest upon mere allegation[s] or denials of his pleading.'" <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993) (quoting <u>Anderson,</u>

5

supra, 477 U.S. at 256), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." Id. at 842 (citations omitted).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the non-moving party's favor. Anderson, supra, 477 U.S. at 255.

## 2.   The Government Contractor Defense

Defendant's claim has its genesis in Boyle v. United Technologies Corp., 487 U.S. 500 (1988), which embellished federal common law in order to recognize the so-called government contractor defense. Boyle held that a government contractor cannot be subject to liability under state law for design defects in military equipment when

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Id. at 512. This standard was formulated to ensure that the federal policy protecting the government in its exercise of discretionary functions is not thwarted by the application of

6

state tort law.[1]  Id. at 511-12.  The first two conditions were devised to determine whether the government's discretionary functions have been implicated in the suit.  "[T]hey assure that the design feature in question was considered by the Government officer, and not merely by the contractor itself."  Id. at 512. The third condition was adopted to encourage manufacturers to pass along their knowledge of any risks, thereby increasing the flow of information available to the government in making its discretionary decisions.  Id. at 512-13.

Presently in contention is the interpretation of Boyle's first condition in the context of a failure-to-warn claim.  As a general matter, courts tend to distinguish between failure-to-warn claims and design defect claims in determining the discretionary function question.  The government's exercise of discretion in choosing a product's design does not by itself establish that the government also exercised discretion in the selection of accompanying warnings.  See Tate v. Boeing

---

[1]The Federal Tort Claims Act subjects the federal government to suits arising from the negligent or wrongful conduct of government employees.  Boyle, supra, 487 U.S. at 511 (citing 28 U.S.C. § 1346(b)).  The FTCA exempts the government from claims arising from the performance of a discretionary function, whether or not such discretion was abused.  Id. (citing 28 U.S.C. § 2680(a)).  The FTCA does not expressly mention whether such exemption extends beyond the government to those entities that contract with the government.

7

<u>Helicopters</u>, 55 F.3d 1150, 1156 (6th Cir. 1995); <u>In re Hawaii Federal Asbestos Cases</u>, 960 F.2d 806, 812-13 (9th Cir. 1992); <u>Dorse v. Eagle-Picher Indus.</u>, 898 F.2d 1487, 1489-90 (11th Cir. 1990); <u>In re Joint Eastern & Southern Dist. N.Y. Asbestos Litig.</u>, 897 F.2d 626, 630-32 (2d Cir. 1990). The possibility remains that while the government contract may focus on the content and design of the product, the issue of warnings was left to the contractor's discretion. <u>In re New York Asbestos</u>, <u>supra</u>, 897 F.2d at 631.

There is less agreement, however, as to how to determine whether the government exercised the level of discretion required by <u>Boyle</u>'s first condition in approving the subject warnings. The generally accepted approach is to focus on whether the contractor could have complied with both its state law duty to warn and its duty under the military contract. <u>See</u> <u>Dorse</u>, <u>supra</u>, 898 F.2d at 1489-90; <u>In re New York Asbestos</u>, <u>supra</u>, 897 F.2d at 630-32. Such decisions have found that if the contract does not prohibit or otherwise conflict with defendant's ability to place safety warnings on the product, the federal contractual duty does not displace the defendant's duty to warn imposed by state law. <u>In re Hawaii</u>, <u>supra</u>, 960 F.2d at 812; <u>Dorse</u>, <u>supra</u>, 898 F.2d at 1489-90. The reasoning is as follows.

8

> "Stripped to its essentials, the military contractor's defense under <u>Boyle</u> is to claim, 'The Government made me do it.' <u>Boyle</u> displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion."

<u>In re Hawaii</u>, <u>supra</u>, 960 F.2d at 813 (quoting <u>In re New York Asbestos</u>, <u>supra</u>, 897 F.2d at 632).

In addition, <u>Boyle</u>'s first condition can be satisfied by evidence that the government meaningfully and substantively approved and evaluated warnings proposed by the contractors. <u>Tate</u>, <u>supra</u>, 55 F.3d at 1157; <u>Oliver v. Oshkosh Truck Corp.</u>, 911 F. Supp. 1161, 1183 (E.D. Wis. 1996)(agreeing with <u>Tate</u> that requiring defendant to establish government dictation or prohibition of warnings "seems too onerous a burden in light of the reasoning of the <u>Boyle</u> Court"). Such approval must transcend rubber-stamping, <u>see</u> <u>Tate</u>, <u>supra</u>, 55 F.3d at 1157, so that it can be fairly said that the warning ultimately selected "reflect[s] a significant policy judgment by Government officials." <u>Boyle</u>, <u>supra</u>, 487 U.S. at 513.

The First Circuit has addressed the issue of when the government's failure to warn can be a "discretionary function" within the meaning of the FTCA, 28 U.S.C. § 2680(a)--although it

has not yet reached the issue of when a government contractor enjoys like protection for its failure to warn. To be discretionary, the government's conduct must include the making of a policy judgment or choice. Dube v. Pittsburgh Corning, 870 F.2d 790, 796 (1st Cir. 1989) (citing Berkovitz v. U.S., 486 U.S. 531, 536 (1988)); see also Ayer v. United States, 902 F.2d 1038, 1044 (1st Cir. 1990) (a discretionary function "'often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness'") (quoting Boyle, supra, 487 U.S. at 511). The mere failure to consider whether or not a warning should be given does not support the idea that the government exercised discretion. Id. at 796-97. Rather, it is critical that the government's failure to warn represented an affirmative decision, including consideration of whether the risks posed by a product justify a warning. Compare id. (Navy's failure to warn domestic bystanders of asbestos hazards was not policy choice where Navy had never considered or adopted a policy to forego such warning) with Barnson v. United States, 816 F.2d 549, 553 (10th Cir.) (discretionary function exception covered federal official's affirmative decision not to warn of risks of radiation exposure, where government produced factors influencing its

10

decision), cert. denied, 484 U.S. 896 (1987) and Ford v. American Motors Corp., 770 F.2d 465, 467 (5th Cir. 1985) (affirmative decision of postal service not to warn buyers of surplus vehicles of risk of roll-overs was policy choice within meaning of discretionary function exception).

Against the above basic legal principles, the court will now examine the merits of the parties' respective motions for summary judgment.

Defendant first argues that it is entitled to summary judgment because the "totality of the procurement process" establishes that the government issued and approved reasonably detailed specifications for the Humvee's design, including that of the vehicle's roll-over protection system. Defendant's Memorandum at 18. A M General contends that because the complete development of the vehicle was dictated by the Army, the court can determine as a matter of law that the decision regarding warnings was solely within the government's discretion. Defendant further relies on conversations between the Army and A M General regarding the safety of the A and B pillars, but such communications do not appear to concern the issue of warnings. Thus defendant here attempts to establish the government's discretion regarding warnings by showing the extent to which the government was involved in other aspects of the vehicle's

11

design.[2]  To support such position, defendant understandably relies on a strain of cases holding that <u>Boyle</u>'s first criteria is satisfied by evidence of the government's continuous participation at various stages in the design and development of the offending military equipment.  <u>Stout v. Borg-Warner Corp.</u>, 933 F.2d 331 336 (5th Cir.) (governmental review and critiques of detailed drawings of air conditioning unit during design stages and testing and evaluation of prototype models amounted to approval of reasonably precise specifications), <u>cert. denied</u>, 940 502 U.S. 981 (1991); <u>Harduvel v. General Dynamics Corp.</u>, 878 F.2d 1311, 1320 (11th Cir. 1989) (extensive analysis and review by government of fighter aircraft's electrical system establishes governmental approval), <u>cert. denied</u>, 494 U.S. 1030 (1990); <u>Smith v. Xerox Corp.</u>, 866 F.2d 135, 137-38 (5th Cir. 1989) (<u>Boyle</u>'s first element established by government's initial supply of relevant specifications for shoulder-mounted weapon which were incorporated into production contract, and government's subsequent review and approval of contractor's final drawings and specifications).

---

[2]Defendant also asserts that it is entitled to summary judgment because of the government's involvement in the provision of warnings.  The court addresses such argument <u>infra</u> at p. 18 n. 3.

12

Defendant's position is problematic for several reasons. First, and obviously, defendant's basic premise--that the government's involvement in the provision of warnings can be inferred by its participation in the design--is flawed. See, e.g., Tate, supra, 55 F.3d at 1156 ("Simply because the government exercises discretion in approving a design does not mean that the government considered the appropriate warnings, if any, that should accompany the product."). See also Bailey v. McDonnell Douglas Corp., 989 F.2d 794, 799 (5th Cir. 1993) ("Boyle makes clear that the requirements of 'reasonably precise specifications' and conformity with them refer to the particular feature of the product claimed to be defective." (quoting Boyle, supra, 487 U.S. at 512)) (emphasis in Bailey). Second, the cases relied upon by defendant are distinguishable from the case at bar in that they primarily address design defect claims and do not offer meaningful discussion regarding a failure-to-warn claim. See, e.g. Harduvel, supra, 878 F.2d at 1316, 1322; Smith, supra, 866 F.2d at 137; cf. Stout, supra, 933 F.2d at 337 n.2 (noting that Smith potentially conflicts with In re New York Asbestos, but declining to reconcile the conflict). Indeed, in one case analyzing a design defect claim, the court explicitly declined to decide whether its reasoning is transferable to a failure-to-warn claim. Stout, supra, 933 F.2d at 337 n.2.

13

Defendant next asserts that because the government contract required that the B pillar be disassembled and packed flat, the government assumed responsibility for the final assembly of the B pillar. However, such evidence does not support, as a matter of law, that the government also assumed the responsibility to purvey warnings about the importance of securing the B pillar. Again, the court "do[es] not see how a federal contract specification requiring a certain product design conflicts with state law requiring a certain set of warnings incident to use of that product or design." In re New York Asbestos, supra, 897 F.2d at 630.

The remaining arguments within defendant's motion for summary judgment relate to Boyle's second and third criteria. Having found that defendant has not met the first condition necessary to establish the government contractor defense against a failure-to-warn claim, the court need go no further. Accordingly, the court finds and herewith rules that the defendant is not entitled to summary judgment.

The court now turns to plaintiff's cross-motion for summary judgment. Plaintiff contends that defendant's government contractor defense should be stricken because defendant fails to offer evidence that the government provided reasonably precise specifications concerning warnings. The court will now examine

14

the evidence in a light most favorable to the nonmovant, which in this case is the defendant.

Relying on the following, plaintiff argues that the responsibility for providing warnings in the operators' and maintenance manuals for the Humvee rested with A M General:

> "Prior to the deployment of the first HMMWV, and as part of the R034 contract requirements, AM General worked with the Government to prepare documentation on the use and maintenance of the HMMWV. In particular, AM General provided an operators manual and maintenance manuals on the HMMWV. These manuals set forth detailed information concerning the maintenance and service of the HMMWV. These manuals also include warnings on the operation of the HMMWV."

Plaintiff's Memorandum in Support of Cross-Motion for Summary Judgment at 5-6 (quoting Gula 2 Aff. ¶ 18).

> "Warnings may come from many sources. The Government may direct the warning, AM General may initiate the warning or other similar vehicle system literature may be the source of the warning. No record is maintained as to the origin of all of the warnings. In all cases, the Government has final approval authority for all warnings."

Id. at 6 (quoting Defendant's Responses to Plaintiff's Fourth Set of Interrogatories (attached as Exhibit 6 to Plaintiff's Cross-Motion Memorandum)).

> "The contractor shall prepare, validate and deliver technical manuals in accordance with Contract Data Requirements List, DD Form 1423, Data Item DI-M-6153 (MOD) inclusive of all addendums thereto. The Government's right to

15

> inspect, reject and require revision to the
> contractor's validation schedule shall be
> exercised within 30 days following receipt by the
> Government of contractor's submittal to the
> Government."

Id. (quoting Defendant's Response to Plaintiff's Sixth Request

for Production, at 22 (attached as "Exhibit 7" to Plaintiff's

Cross-Motion Memorandum)).

> "Technical manuals are the official medium for
> providing technical information, instruction, and
> safety procedures, pertaining to the operation,
> installation, maintenance, and modification of
> equipment[] and materials . . . . Publications
> will be prepared in accordance with the current
> specifications and instructions listed on the
> addenda to this data item description."

Id. (quoting Exhibit 7, at 2).

Plaintiff further observes that the primary focus of the

production contract is to dictate the format of the technical

manuals. With the exception of requiring the manual to contain a

warning concerning the use of compressed air, the contract

appears to leave the development of additional warnings to the

contractor's discretion, subject to final approval by the

government. Finally, plaintiff claims that the "vast majority"

of the warnings within the operators' manual were prepared by A M

General, without significant involvement of the Army. See

Plaintiff's Reply Memorandum at 3 (and attachments).

16

According to defendant, however, there is sufficient evidence to support its position that the government cooperated with A M General in the development of the warnings contained in the operators' manual.  Defendant attaches to its objection certain government documents which it claims "demonstrate an exchange between the contractor and the military as to various suggested warnings or changes in the specifications."  Defendant's Memorandum at 3.  Defendant relies upon assorted documents, the first of which is entitled "Inclusion of 'Warning' on Transporting Personnel in the High Mobility Multipurpose Wheeled Vehicle (HMMWV) Manual."  <u>See</u> documents attached to Defendant's Memorandum as Exhibit B.  In said documents, the government records its "concern about the lack of rollover protection on [Humvee] troop seats" and requests that a "caution note" be added to the operators' manual.  Exhibit B at 5.  The documents further indicate that the government reviewed in detail and possibly proposed that the following warning be included in the Humvee operators' manual:

<u>WARNING</u>

Extreme caution shall be taken when transporting personnel.  Rollover protection is available for the crew area only and is not provided in the troop/cargo area.  Failure to use basic safe driving skills may result in injury or death to personnel and damage to equipment.

17

a. Exercise extreme caution when transporting personnel. Rollover protection is available for the crew area only and is not provided in the troop/cargo area. Although certain design characteristics of the vehicle, such as vehicle width, ground clearance, independent suspension, etc. provide improved capabilities, accidents can still happen.

b. Operators are reminded to observe basic safe driving techniques/skills when operating the vehicle, especially when transporting personnel. Vehicle speed must be reduced consistent with weather and road/terrain conditions. Obstacles such as stumps and boulders must be avoided. Failure to use basic safe driving techniques/ skills may result in injury or death to personnel and damage to equipment.

Exhibit B at 1.

The court is persuaded that it would not be appropriate to strike the government contractor defense in its totality at present, as defendant has established the existence of a genuine issue of fact.[3] See In re New York Asbestos, supra, 897 F.2d at 632. The record raises conflicting inferences as to whether the warnings within the operators' manual "reflect a significant policy judgment by Government officials," see Boyle, supra, 487 U.S. at 513, and as to whether the government controlled or significantly limited A M General's ability to provide a warning,

---

[3]Defendant avers that the evidence it has submitted in support of its objection provides further fodder to support its motion for summary judgment. However, the existence of a genuine issue of fact precludes entry of summary judgment in defendant's favor.

see, e.g., In re New York Asbestos, supra, 897 F.2d at 632. Plaintiff's submissions indicate, in part, that A M General had the power to select which warnings were to be included in the manual. However, defendant's evidence, and portions of plaintiff's own submissions, call that inference into question, as there is evidence that the manual was a joint effort between A M General and the government, that the manual had to comply with government specifications, and that the government dictated or controlled the content of at least one warning concerning the safety of the roll-over protection system. It thus appears that the government may have made a reasoned, policy-based judgment as to how the manual would describe the dangers of the roll-over protection system. Therefore, the question of the extent to which A M General had discretion to warn of other dangers of the roll-over protection system is best left to the trier of fact.

Plaintiff also maintains that A M General had the discretion to provide a warning on the vehicle itself in the form of a sticker or decal. Defendant responds with a battalion of evidence that it believes contradicts plaintiff's assertion. For example, defendant submits government specifications which provide for the nature of the painted finish of the vehicle. See Specifications (attached as Exhibit A to Defendant's Objection Memorandum). In addition, defendant proffers an affidavit of the

19

vice president and general counsel of A M General Corp., who states that under its contract with the government, A M General is not free to make unilateral changes and that "[a]ny changes to the vehicle, including the posting of decals, placards, or other such warning labels on the vehicle would require the specific approval and direction of . . . TACOM." Affidavit of Thomas R. MacDougall ¶ 7 (attached to Defendant's Motion for Leave to File Reply Memorandum Affidavit).

As an example of how the approval process takes place, defendant describes the procedure by which a warning decal relating to the use of the vehicle's hand throttle came into being. First, A M General wrote a letter to the Army stating its concern about the danger of the hand throttle and recommending that a warning decal be affixed to the dashboard. See Letter dated May 13, 1986 (attached as "Exhibit C" to Defendant's Objection Memorandum). The military subsequently reviewed A M General's recommendation and then incorporated in the vehicle's specifications a specific section entitled "Hand Throttle Decal". See Specification 3.4.1.14 (attached as Exhibit A to Defendant's Objection Memorandum) and Exhibit C. Defendant contends that such process shows that the government approved reasonably precise specifications, within the meaning of Boyle, and thus

20

defendant would not have had the discretion to provide other such labels.

Defendant's submissions arguably show that the government "approved reasonably precise specifications" regarding the paint finish and hand throttle warning label; they also show that before defendant could provide any additional warning labels A M General would have to go through government channels. However, such evidence does not shed light on whether the government even considered the possibility of adding a label to the Humvee concerning the general safety features of the roll-over protection device, much less a more specific warning to secure the A and B Pillars before operation. Because no reasoned, affirmative decision by the government was made to forego warning of such risk, it does not appear that the government exercised discretion. See Dube, supra, 870 F.2d at 796-801 (before failure to warn can constitute discretionary function, government must make affirmative decision, based on policy concerns). Nor does it appear that the government prohibited or significantly limited A M General's ability to provide a warning label of the kind desired by plaintiff, or that the government itself "dictated" the contents of such warnings. Indeed, the evidence suggests just the opposite, as the evidence submitted by A M General shows that A M General could have made changes to the warning labels,

21

albeit subject to the government's approval.  Accordingly, the court must grant plaintiff's motion for summary judgment insofar as plaintiff seeks to strike the defense regarding the provision of warning stickers.

## Conclusion

For the reasons set forth herein, the court denies defendant's motion for summary judgment (document 13) and grants, in part, plaintiff's cross-motion for summary judgment striking the government contractor defense (document 22).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

March 28, 1996

cc:  Stephen R. Fine, Esq.
     Robert G. Whaland, Esq.

22