## In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.

Shirley IVY, Individually and as Representative of the Estate of Donald Ivy, Deceased; Charles Jardon and Tony K. Jardon, Individually and as Next Friend of Charles Jardon, Jr.; Robin Jardon, Warren Jardon and Sharon Jardon; Verda Wilson, Individually and as Representative of the Estate of Isaiah Wilson, Jr., Deceased; Shirley Zalewaski, Individually and as Representative of the Estate of Yen Zalewaski, Deceased; Gary Thomas; Mary Lee Thomas; James L. Kent; Emma I. Kent; Dawn Marie Inman, Individually and as Representative of the Estate of Bobby Joe Inman, Deceased; Earl Thompson; Judy L. Thompson; James Donald Deloatch; Joyce Deloatch; Peggy Sands, Individually and as Representative of the Estate of Martin Sands, Deceased; Emile Annibolli; Ursula Margot Parry, Individually and as Representative of the Estate of James D. Parry, Sr., Deceased; James D. Parry, Jr.; James Christopher Parry; Laura Jenkins, Individually and as Representative of the Estate of Eddie Jenkins, Deceased; Ronald L. Hartman, Katherina H. Hartman, and as Next Friend to Jeffery Alan Hartman and Angela Marie Hartman, Both minors individually and as Representative of those similarly situated, Plaintiffs–Appellants,

James White, Individually and as Representative of the Estate of Clarence White, Deceased; Charles Brown, Plaintiffs,

v.

DIAMOND SHAMROCK CHEMICALS COMPANY, also known as Diamond Shamrock Refining & Marketing Company, also known as Occidental Electro Chemical Corporation, also known as Maxus Energy Corp., also known as Occidental Chemical Corporation, also

known as Diamond Shamrock Co.; Dow Chemical Company; Monsanto Company; Uniroyal, Inc.; Hercules, Inc.; Thompson–Hayward Chemical Company; T.H. Agriculture & Nutrition Company, Inc., Defendants–Appellees.

Nos. 670, 831, 818, Dockets 92–7537, 92–7573, 92–7575.

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1993.

Decided June 24, 1993.

Robert M. Hager, Washington, DC, Benton Musslewhite, Houston, TX (Kelly L. Newman, of counsel), for plaintiffs-appellants.

John C. Sabetta, New York City (Lord Day & Lord, Barrett Smith, of counsel), for defendant-appellee Monsanto Co.

Steven R. Brock, New York City (Rivkin, Radler & Kremer, Uniondale, NY, of counsel), for defendant-appellee Dow Chemical Co.

Michael M. Gordon, New York City (Cadwalader, Wickersham & Taft, of counsel), for defendant-appellee Diamond Shamrock Chemicals Co.

Shea & Gould, New York City, for defendant-appellee Uniroyal, Inc.

Kelley, Drye & Warren, New York City, for defendant-appellee Hercules, Inc.

Clark, Gagliardi & Miller, White Plains, NY, for defendant-appellee T.H. Agriculture & Nutrition Co., Inc.

The States of Ala., Ark., Hawaii, Idaho, Ill., Ind., Kan., La., Minn., Nev., N.J., N.M., New York, N.D., Ohio, S.D., Tex., Utah, Vt., W.Va., and the Com. of Mass. (Kenneth J. Chesebro, Cambridge, MA; Brian Stuart Koukoutchos, Lexington, MA; James H. Evans, Atty. Gen., Montgomery, AL; Winston Bryant, Atty. Gen., Little Rock, AR; Robert A. Marks, Atty. Gen., Honolulu, HI; Larry Echohawk, Atty. Gen., Boise, ID; Roland W. Burris, Atty. Gen., Chicago, IL; Linley E. Pearson, Atty. Gen., Indianapolis, IN; Robert T. Stephan, Atty. Gen., Topeka, KS; Richard P. Ieyoub, Atty. Gen., Baton Rouge, LA; Scott Harshbarger, Atty. Gen., Boston, MA; Hubert H. Humphrey, III, Atty. Gen., St. Paul, MN; Frankie Sue Del Papa, Atty. Gen., Carson City, NV; Robert J. Del Tufo, Atty. Gen., Trenton, NJ; Tom Udall, Atty. Gen., Santa Fe, NM; Robert Abrams, Atty. Gen., New York City; Nicholas J. Spaeth, Atty. Gen., Bismarck, ND; Lee Fisher, Atty. Gen., Columbus, OH; Mark Barnett, Atty. Gen., Pierre, SD; Dan Morales, Atty. Gen., Austin, TX; Paul Van Dam, Atty. Gen., Salt Lake City, UT; Jeffrey L. Amestoy, Atty. Gen., Montpelier, VT; Mario J. Palumbo, Atty. Gen., Charleston, WV, of counsel), amici curiae in Support of appellants.

Center for Claims Resolution, Princeton, NJ (Lawrence Fitzpatrick, John Gaul, Princeton, NJ, John D. Aldock, Frederick C. Schafrick, Laura S. Wertheimer, Elise J. Rabekoff, Shea & Gardner, Washington, DC, of counsel), amicus curiae in Support of appellees.

Before: VAN GRAAFEILAND, KEARSE and CARDAMONE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Two groups of veterans and their family members, who sue both individually and on behalf of others similarly situated, appeal from a judgment of the United States District Court for the Eastern District of New York (Weinstein, J.) dismissing their tort claims against seven chemical companies which manufactured the defoliant Agent Orange. *Ryan v. Dow Chemical Co.*, 781 F.Supp. 902 (E.D.N.Y.1991). In addition to their claim of substantive error, appellants contend that the district judge erred in refusing to remand their cases to the state court from which they were removed and in denying their motion that he disqualify himself for conflict of interest or appearance of partiality. For the reasons that follow, we affirm.

These actions are an attempted revival of the massive tort litigation (collectively *"Agent Orange I "*), which arose from the United States Armed Services' use of Agent Orange during the Vietnam War. Because both the history of the litigation and the background of the instant actions have been chronicled in the opinion below, 781 F.Supp. at 904–14, a brief summary will suffice for present purposes.

While serving in Vietnam, several hundred thousand soldiers were exposed to Agent Orange, which contained traces of the chemical 2,3,7,8–tetrachlorodibenzo–$p$–dioxin ("dioxin"). Following their return home, many veterans complained of illnesses, which they attributed to this exposure. In 1978, these veterans began to seek redress through the courts, suing both the United States and the manufacturers of Agent Orange.

In 1979, the Judicial Panel on Multidistrict Litigation consolidated hundreds of the cases and transferred them to the Eastern District of New York. Subject matter jurisdiction over these cases originally was based on the asserted existence of a question of federal common law, but, after we reversed on this issue, 635 F.2d 987 (2d Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), jurisdiction was found to exist on the basis of diversity of citizenship.

In December 1983, the district court certified a Rule 23(b)(3) "common question" class with opt-out rights in order to address the common issues of general causation and the military contractor defense, and a Rule 23(b)(1)(B) "limited fund" class for punitive damage claims. 100 F.R.D. 718 (E.D.N.Y, 1983), *mandamus denied*, 725 F.2d 858 (2d Cir.), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The Rule 23(b)(3) class was defined as:

those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides.... The class also includes spouses, parents, and children of the veterans born before January 1, 1984, directly or derivatively injured as a result of the exposure.

*Id.* at 729. Notice was provided to class members by mail where feasible and by advertisements in the print and broadcast media. *Id.* at 729–30. The deadline to opt out of the Rule 23(b)(3) class was May 1, 1984; 2,440 potential plaintiffs opted out by the deadline, although all but 282 eventually opted back into the class.

A tentative settlement was reached on May 7, 1984, the day the trial was scheduled to begin. The Settlement Agreement provided for the establishment of a $180 million settlement fund to cover all claims arising out of Agent Orange exposure, and a claim against this fund was made the exclusive remedy for all class members. A $10 million reserve was created to indemnify the defendants for any state court judgments obtained by class members. The Settlement Agreement stated that "[t]he Class specifically includes persons who have not yet manifested injury," and it forever barred class members from instituting or maintaining an action against defendants based on exposure to Agent Orange. *See* 597 F.Supp. 740, 862–66 (E.D.N.Y.1984) (reprinting Settlement Agreement).

The settlement was approved on September 25, 1984 after extensive, nationwide fairness hearings, *see id.* at 740–862, and the approval was reaffirmed on January 7, 1985, *see* 611 F.Supp. 1296, 1347. On July 9, 1985, the district court granted an order directing consummation of the settlement "in accordance with its terms," dismissing all class members' claims, permanently barring class members from instituting or maintaining future actions arising from Agent Orange exposure, and retaining jurisdiction over the maintenance, administration and distribution of the settlement fund. 618 F.Supp. 623, 624–25 (E.D.N.Y.1985). The court also granted summary judgment against the opt-out plaintiffs based on their failure to prove causation and on the military contractor defense. 611 F.Supp. 1223 and 1267 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). We affirmed the certification, maintenance and settlement of the class action in all significant and relevant respects. 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988).

The final distribution plan for the settlement fund was announced on July 5, 1988 following the termination of all appeals. 689 F.Supp. 1250. Roughly three-fourths of the fund, which by then had grown to approximately $240 million, was allocated to the Agent Orange Veteran Payment Program. This Program provides payments on the death or disability of class members. By September 30, 1991, it had disbursed over $86 million and had processed more than fifty thousand claims. Twenty-eight percent of the disability claims processed by the fund were for disabilities manifesting themselves after May 7, 1984; more than half of the death claims were for deaths occurring after May 7, 1984. 781 F.Supp. at 910. By September 30, 1992, the Payment Program had disbursed more than $146 million to disabled veterans or their survivors and had processed more than sixty thousand claims. *Report of the Special Master on the Distribution of the Agent Orange Settlement Fund,* Fourth Annual Report, at 11–12.

Most of the remaining quarter of the settlement fund was allocated to the Agent Orange Class Assistance Program ("AOCAP"), which made grants to agencies serving Vietnam veterans and their families. Among the activities assisted by those grants were veteran counselling, aiding the obtaining of Government veterans' benefits, and administering training programs for agencies dealing with Vietnam veterans and their employees. As of September 31, 1992, AOCAP had awarded roughly $33.6 million in grant funds, benefitting more than 101,000 veterans and family members nationwide. *See* Fourth Annual Report, *supra*, at exh. D. That portion of the $10 million indemnity

reserve that will not have been used to satisfy state court judgments by 1994 will revert to this fund. Originally, the district court provided for management of the AOCAP fund by an independent foundation. We reversed on this point and ordered that Judge Weinstein maintain direct oversight of the Program. 818 F.2d 179, 184–86 (2d Cir. 1987). In managing AOCAP, Judge Weinstein consults with an advisory board of Vietnam veterans.

In 1989 and 1990, two overlapping class actions, *Ivy v. Diamond Shamrock Chemicals Co.* and *Hartman v. Diamond Shamrock Chemicals Co.*, were brought in Texas courts. Both alleged that the named plaintiffs or their family members suffered injury as a result of Agent Orange exposure and that the injuries sustained by these plaintiffs did not manifest themselves or were not discovered until after May 7, 1984, the *Agent Orange I* settlement date. Both complaints sounded exclusively in state law and explicitly abjured reliance on federal law. Defendants removed the cases to the United States District Courts for the Eastern and Southern Districts of Texas, alleging "artful pleading" of a federal claim or, alternatively, complete federal preemption. The Judicial Panel on Multidistrict Litigation transferred the cases to the Eastern District of New York.

On January 31, 1990, the *Ivy* plaintiffs petitioned this court for a writ of mandamus directing remand. On March 28, we denied the motion, ruling that the question of subject matter jurisdiction should be decided in the first instance by the district court. *In re Ivy*, 901 F.2d 7, 10 (2d Cir.1990). Plaintiffs then moved in the district court for remand of both cases. The district court heard oral argument on March 6, 1991, and scheduled an additional hearing on the motion to remand and other motions for May 6, 1991, to allow for further briefing. In the interim, defendants moved to dismiss and to amend their notice of removal to assert federal officer removal pursuant to 28 U.S.C. § 1442(a)(1).

The district court remanded the claims of two civilian plaintiffs alleging injury, holding that they were not within the *Agent Orange I* class and that federal officer removal was

inapplicable. *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934 (E.D.N.Y.1992). The court denied the motion to remand of the veteran plaintiffs and their family members and dismissed their claims as barred by the *Agent Orange I* settlement and the court's order enjoining future suits by class members. 781 F.Supp. 902, 918–20. Plaintiffs moved for reconsideration of the latter decision and for disqualification of Judge Weinstein pursuant to 28 U.S.C. § 455. The court, in an unpublished order, denied both motions and kept its original decision substantially intact.

## FEDERAL JURISDICTION

■ As a general rule, a state case may be removed to federal court only if federal jurisdiction is evident on the face of the plaintiff's well-pleaded complaint. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). This rule is not satisfied with respect to the complaints herein. There is no complete diversity of citizenship, and no federal issue is apparent in the complaints. Indeed, the complaints explicitly disclaim reliance on federal law. Accordingly, in order to be removable, the *Ivy* and *Hartman* cases must fall within an exception to the "well-pleaded complaint" rule. The district court asserted two such exceptions—plaintiffs' "artful pleading" of a federal question, and the court's residual authority under the All Writs Act to preserve its jurisdiction. We address these in order.

■ Ordinarily, a plaintiff is master of his complaint and may elect to proceed solely under state law even if federal remedies are available. *See Caterpillar, supra,* 482 U.S. at 392, 107 S.Ct. at 2429; *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913). However, a complaint which appears to be grounded solely in state law actually may be federal in nature, and thus removable, if its true nature has been disguised by the plaintiff's artful pleading. *See generally* 14A Charles A. Wright *et al., Federal Practice and Procedure* § 3722, at 266–75 (2d ed. 1985). Because state and federal laws have many overlapping or even identical remedies and because generally we respect a plaintiff's choice between state and federal forums, this excep-

tion to the well-pleaded complaint rule is necessarily a narrow one.

 The district court justified removal in the instant case on the authority of *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981), as interpreted by *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 760 (2d Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986). Under *Sarkisian's* interpretation of *Moitie,* a state law claim is an artfully-pleaded federal claim if (1) the plaintiff previously had elected to proceed in federal court on a claim expressly grounded on federal law and (2) the elements of the subsequent state law claim are virtually identical to those of the claim previously made. *Id.* However, the instant case was not removable under the *Sarkisian* test, because the prior claim was not expressly grounded on federal law but instead was a diversity claim based on general tort law. The district court interpreted *Sarkisian* to require only that "the elements of the [subsequent] claim ... be 'virtually identical' to those in the prior federal action," stating that "there is no indication that the Court of Appeals intended to ... limit its reach" to those cases where the prior federal court action was based on federal question jurisdiction. 781 F.Supp. at 917. This was a misreading of *Sarkisian,* which explicitly requires that the prior claim be "expressly grounded on federal law." 794 F.2d at 760; *see also Ultramar America Ltd. v. Dwelle,* 900 F.2d 1412, 1414–17 (9th Cir.1990).

 Alternatively, the district court found authority for removal in its power under the All Writs Act to issue writs "necessary or appropriate" in aid of its jurisdiction. 28 U.S.C. § 1651. Here, the district court was on sounder ground. A district court, in exceptional circumstances, may use its All Writs authority to remove an otherwise unremovable state court case in order to "effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977).

 If Agent Orange victims were allowed to maintain separate actions in state court, the deleterious effect on the *Agent Orange I* settlement mechanism would be substantial. The parties to the settlement implicitly recognized this when they agreed that all future suits by class members would be permanently barred. It is difficult to conceive of any state court properly addressing a victim's tort claim without first deciding the scope of the *Agent Orange I* class action and settlement. The court best situated to make this determination is the court that approved the settlement and entered the judgment enforcing it. Removal in the instant case was an appropriate use of federal judicial power under 28 U.S.C. § 1651. *See United States v. City of New York,* 972 F.2d 464, 469 (2d Cir.1992); *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855, 863–64 (2d Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989). In so holding, we are not unmindful of the fact that the All Writs Act is not a jurisdictional blank check which district courts may use whenever they deem it advisable. "Although that Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pennsylvania Bureau of Correction v. United States Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985). Given the "exceptional circumstances" surrounding the instant case, issuance was a proper exercise of judicial discretion. The district court was not determining simply the preclusive effect of a prior final judgment on claims or issues expected to be raised in subsequent collateral proceedings; it was enforcing an explicit, ongoing order against relitigation of matters it already had decided, and guarding the integrity of its rulings in complex multidistrict litigation over which it had retained jurisdiction.

Appellees contend that the instant case was removable pursuant to 28 U.S.C. § 1442(a), which in pertinent part allows removal of actions against "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Although appellees sought to

amend their notice of removal to assert this as an additional basis for removal, the district court did not rule on their application to amend. Because our decision is supported on other grounds, we too decline to reach this question.

■ Appellants' additional arguments against the district court's assumption of jurisdiction are not persuasive. They contend, for example, that removal in the instant case violates the Anti–Injunction Act, 28 U.S.C. § 2283, which prohibits a federal court from "grant[ing] an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." This contention is without merit. Assuming without deciding that removal of a case from state court to federal court is sufficiently akin to an injunction to come within the Act's ambit, the facts of the instant case bring it squarely within the above-mentioned exceptions to the Act. First, the district court's removal was "necessary in aid of its jurisdiction." Judge Weinstein has continuing jurisdiction over the *Agent Orange I* class action, not only to administer the settlement fund, *see* 818 F.2d at 184–86; 618 F.Supp. at 625, but also to ensure that the Settlement Agreement as a whole is enforced according to its terms. *See Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.1974). "In a class action, the district court has a duty to class members to see that any settlement it approves is completed, and not merely to approve a promise...." *In re Corrugated Container Antitrust Litig.*, 752 F.2d 137, 141 (5th Cir.), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3536, 87 L.Ed.2d 660 (1985). Second, removal was needed "to protect or effectuate" the district court's *Agent Orange I* judgment. This exception in the statute authorizes a federal court to proscribe state litigation of an issue that actually has been previously presented to and decided by the federal court. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127 (1988). A review of the arguments, orders and judgment in *Agent Orange I* makes it crystal clear that the court in fact did determine the central issue of class membership raised here, i.e., that persons who

had yet to manifest injury were class members. *See, e.g.,* Settlement Agreement ¶ 8, 597 F.Supp. at 865 ("The Class specifically includes persons who have not yet manifested injury.").

■ Appellants contend that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, particularly *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), require that the district court abstain from exercising jurisdiction in deference to the Texas state courts. This argument stands the *Younger* doctrine on its head. *Younger* teaches us to recognize the interest of the states in protecting the authority of their judicial system so that their orders and judgments are not rendered nugatory. *Pennzoil, supra,* 481 U.S. at 14 n. 12, 107 S.Ct. at 1527 n. 12 (quoting *Juidice v. Vail*, 430 U.S. 327, 336 n. 12, 97 S.Ct. 1211, 1218 n. 12, 51 L.Ed.2d 376 (1977)). The application of *Younger,* as advocated by appellants, would threaten the authority of the federal judicial system and potentially nullify the federal courts' orders and judgments. This result is not the sort of federal-state comity envisioned in *Younger* and *Pennzoil. See Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 264 n. 8, 97 S.Ct. 1047, 1051 n. 8, 51 L.Ed.2d 313 (1977).

Appellants also assert that the district court did not have personal jurisdiction over them. This argument is frivolous. *See* 818 F.2d at 163. Likewise, there is no merit in their argument that removal in these cases interferes with their right to collaterally attack the *Agent Orange I* judgment by denying them the forum of their choice. Although appellants' attack is founded on their constitutional right to due process, nothing in the Constitution or in our jurisprudence demands that class members have an unchallengeable choice of forums in which to launch it. While the law as a general rule permits a plaintiff to choose his forum, that freedom is not absolute, as the removal, venue and multidistrict litigation statutes and the personal jurisdiction and *forum non conveniens* doctrines all demonstrate. It is obvious, from what presently is occurring herein, that the

removal and multidistrict transfer in the instant case have not impinged unduly upon appellants' right of collateral attack.

### CLASS MEMBERSHIP

■ Having resolved the preliminary jurisdictional questions, we turn to the central question of appellants' membership *vel non* in the *Agent Orange I* class. The answer to this question lies in the meaning of the phrase "who were injured while in or near Vietnam from exposure to Agent Orange." Appellants contend that persons are not "injured" until medical symptoms become manifest. Appellees argue in response that injury occurs when a deleterious substance enters a person's body, even though its adverse effects are not immediately apparent. In the instant case, appellees' definition is correct.

The words "injury" and "injured" appear to have received the attention of courts and legislatures most often where limitation periods for suit are involved. For example, some authorities hold that the prescribed limitation period begins to run when one's personal physical rights are invaded; others hold that the limitation period does not begin to run until the hurt or damage resulting from the invasion is discovered. Absent a specific statutory mandate to the contrary, the definition of "injury" and "injured" generally remains the same regardless of which limitation period is applied; i.e., the limitation runs either from the time the "injury" occurs or the time the damage resulting from the "injury" is discovered. In the strict legal sense " '[i]njury' means a wrongful invasion of legal rights, and is not concerned with the hurt or damage resulting from such invasion...." 43A C.J.S. *Injury* at 767; *see also Restatement (Second) of Torts* § 7.

In this respect, reference to the history of New York State's limitation period governing suits for personal injuries is illuminating. The traditional rule in New York is that the injury occurs and the limitation period begins to run when there is a wrongful invasion of one's personal rights, not when the damage allegedly resulting from the invasion is discovered. *See Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 300, 200 N.E. 824 (1936); *Thornton v. Roosevelt*

*Hosp.*, 47 N.Y.2d 780, 781, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979) (mem.).

Recognizing the possible adverse effect this traditional rule might have on veterans claiming injury from Agent Orange, the New York Legislature, in 1981, decided that such claims "should not be prohibited by the holding that a cause of action accrues, and the statute of limitations commences to run from the 'date of injury.' " *See Legislative Findings: Victims of Herbicide Agents*, Section 1 of L.1981, c. 266, *eff.* June 16, 1981, *reprinted in* footnote to N.Y.Civ.Prac.L. & R. § 214–b (McKinney 1990). The Legislature therefore provided in section 214–b that a veteran's action to recover damages for "personal injury" caused by contact with or exposure to Agent Orange "while serving" in Indo–China between 1962 and 1975 may be commenced within two years from the date of discovery of "such injury." This enactment changed the onset of the limitation period; it did not change the meaning of the word "injury."

From the very outset of the litigation in *Agent Orange I*, the plaintiffs adopted this meaning and urged it repeatedly upon the district court. The initial class action complaint alleged that the action was brought on behalf of, among others, "those individual veterans manifesting no symptoms of illness and disease at present, but at risk of genetic and somatic damage." In response to the defendants' motion to dismiss the "at risk" claims, plaintiffs argued in both the district court and this court:

> The "injury" in the Agent Orange cases has already occurred. The plaintiffs "at risk" have already been exposed to the toxic substance.

> \* \* \* \* \* \*

> The at risk argument of the Defendant war contractors obscures the fact that every individual Plaintiff has been injured in fact.... We have asked the Court to recognize that there is injury, in fact.

> \* \* \* \* \* \*

> Judge, at the risk of delivering a short lecture on the medicine in this case, the exposure to the toxicant produced a physiological event, an injury within the mean-

ing of the word "injury" in the technical law of torts.

The district court was fully aware of the New York Legislature's use of the term "personal injury" in section 214–b and its legislative preamble. *See* 597 F.Supp. at 810–11. In response to plaintiffs' urging, it adopted and approved similar usage in the Settlement Agreement and the judgment that incorporated it. *See id.* at 879, 870. There thus can be no question concerning the district court's intent or that of the parties to the Settlement Agreement. "At risk" veterans, i.e., victims with no visible symptoms, were included in the plaintiff class.

In our prior opinion affirming the class settlement, 818 F.2d 145, we recognized the propriety of this inclusion, because the military contractor defense was common to all of the plaintiffs' cases and, if successfully interposed, "would have precluded recovery by all plaintiffs, irrespective of the strengths, weaknesses, or idiosyncracies of their claims." *Id.* at 167. Appellants' arguments against class membership are no stronger now than they were when made in 1987.

Appellants' contention that they could not have been within the *Agent Orange I* class at the time of settlement because they did not have an "injury in fact," suggests a different meaning of that term than has been enunciated in numerous cases involving liability insurance coverage for injuries such as those sustained by appellants. Although the issue in the insurance cases is liability rather than jurisdiction, the controversy over the meaning of the term "injury in fact" is subject to judicial resolution in much the same manner as it is in the instant case. Thus, in *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760 (2d Cir.1984), we said that "[s]ome types of injury to the body occur prior to the appearance of any symptoms; thus, the manifestation of the injury may well occur after the injury itself." *Id.* at 764. We rejected the argument appellants now make that "injury in fact" means injury that is manifest, diagnosable or compensable. *Id.* at 764–65. *See also Aetna Casualty & Surety Co. v. Abbott Labs., Inc.*, 636 F.Supp. 546, 548–49 (D.Conn.1986).

In *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368 (E.D.N.Y.1988), the issue before the court was whether Uniroyal was entitled to reimbursement from Home for Uniroyal's contribution to the *Agent Orange I* settlement. Apropos of the issue now before us, Judge Weinstein wrote:

> In this case there can be no doubt when the injury must be deemed to have taken place. The parties stipulated that any injury from exposure to Agent Orange took place "at or shortly after a serviceman's exposure to Agent Orange spraying."
>
> The force of the Olson Affidavit and the stipulation is to determine, for the purposes of this insurance litigation, that injury in fact took place within a week or so of spraying.

*Id.* at 1389. Although this decision is not binding in the instant case, its conclusion that plaintiffs sustained an "injury in fact" is eminently correct. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

Appellants' argument that they could not have been members of the *Agent Orange I* class because their claims did not satisfy the $10,000 amount-in-controversy requirement of 28 U.S.C. § 1332 as it then existed, was rejected by this court on the original *Agent Orange I* appeal, 818 F.2d at 163. We there said, quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938):

> [U]nless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

We followed the same reasoning in *In re Joint E. and S. Dist. Asbestos Litig.*, 982 F.2d 721, 734 (2d Cir.1992), despite the fact that the amount-in-controversy requirement had been raised by then to $50,000. Further repetition of this rule is unnecessary. We are satisfied that appellants' *Agent Orange I* claims, made in good faith, satisfied the monetary jurisdiction requirements.

Appellants next contend that they are not bound by the *Agent Orange I* class action

and settlement because the court did not have personal jurisdiction over them. We rejected this argument on the appeal in *Agent Orange I,* 818 F.2d at 163. We there quoted the Judicial Panel ·on Multidistrict Litigation to the effect that transfers under 28 U.S.C. § 1407, the multidistrict litigation statute, "are simply not encumbered by considerations of in personam jurisdiction and venue" and that the transferee judge has all the pretrial jurisdiction the transferor judge would have had if the transfer had not occurred. We then proceeded in that opinion to discuss the adequacy of notice of the class action and proposed settlement, *id.* at 167–70, and held that the notices were adequate. Our view has not changed.

Appellants contend, as did appellants in *Agent Orange I,* that all class members did not receive adequate notice of their membership in the *Agent Orange I* action and the opportunity to exclude themselves therefrom. This, appellants allege, was a due process violation under the standards of *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Appellants misapprehend the reach of *Shutts.* The Court's decision in that case "is limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominantly for money judgments," and "intimate[s] no view concerning other types of class actions." *Id.* at 811 n. 3, 105 S.Ct. at 2974 n. 3. As such, "*Shutts* does not apply directly to classes of unknown plaintiffs." *See 1 Newberg on Class Actions* § 1.23, at 1–54 (3d ed. 1992). We distinguished *Shutts* in *Agent Orange I,* pointing out that here "there was no easily accessible list of veterans, as there must have been of royalty holders in [*Shutts*]." 818 F.2d at 169.

We again decline to extend the *Shutts* holding into situations such as this. "Due process, the courts have often declared, 'is a flexible concept,' intended to ensure 'fundamental fairness.' " *In re A.H. Robins Co.,* 880 F.2d 709, 745 (4th Cir.) (quoting *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985) and *Matthews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)), *cert. denied,* 493 U.S.

959, 110 S.Ct. 376, 377, 107 L.Ed.2d 362 (1989). What process is due in a given instance requires the balancing of a variety of interests. In some cases, "the marginal gains from affording an additional procedural safeguard ... may be outweighed by the societal cost of providing such a safeguard." *Walters, supra,* 473 U.S. at 320–21, 105 S.Ct. at 3189.

In the instant case, society's interest in the efficient and fair resolution of large-scale litigation outweighs the gains from ·individual notice and· opt-out rights, whose benefits here are conjectural at best. As appellants correctly note, providing individual notice and opt-out rights to persons who are unaware of an injury would probably do little good. Their rights are better served, we think, by requiring that "fair and just recovery procedures be[ ] made available to these claimants," 1 *Newberg, supra,* § 1.23, at 1–56, and by ensuring that they receive vigorous and faithful vicarious representation.

It is axiomatic that a class action binds absent members only so long as they were adequately represented therein. ˙ *See generally Hansberry v. Lee,* 311 U.S. 32, 41, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940). Our decision in *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir.1968), describes the requisites of adequate representation as follows:

> [A]n essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary˙to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class.

*Id.* at 562. Appellants do not challenge the qualifications of the *Agent Orange I* class counsel. Moreover, their conflict-of-interest claims are unpersuasive. Although, as the district court noted, "[o]ne can imagine many genuine conflicts of interest" in a situation such as this, the court concluded that any potential conflicts that might have infected *Agent Orange I* never materialized:

> In many cases the conflict between the interests of present and future claimants is more imagined than real. In the instant

case, for example, the injustice wrought upon the plaintiffs is nonexistent. These plaintiffs, like all class members who suffer death or disability before the end of 1994, are eligible for compensation from the Agent Orange Payment Fund. The relevant latency periods and the age of the veterans ensure that almost all valid claims will be revealed before that time.

781 F.Supp. at 919.

We agree with the district court that designation of a subclass of future claimants and appointment of a guardian to represent their interests was unnecessary "because of the way [the settlement] was structured to cover future claimants." *Id.* As Judge Weinstein noted in one of the fairness hearings that he conducted:

> to appoint another attorney to represent that sub-group would just, in my opinion, increase the amount of legal fees, which is what all of us want to keep to a bare minimum. There are lots of arguments and classes and sub-classes, but if we appoint attorneys and guardians ad litem for everybody who might have ... somewhat of a conflict of interest, there is hardly going to be any money left for the veteran.

Appellants' blanket allegation that the *Agent Orange I* settlement was collusive is patently frivolous. When appellants' counsel was pressed at oral argument to indicate some factual support for the allegation, he was unable to do so. Indeed, when one reads contemporaneous accounts of the settlement negotiations, which we described as having been "dramatically arrived at just before dawn on the day of trial after sleepless hours of bargaining," 818 F.2d at 166, it is impossible to envision any collusion between plaintiffs and defendants. By all accounts, the negotiations were arm's-length and adversarial, even fierce. *See generally* Peter H. Schuck, *Agent Orange on Trial* 143–67 (1986); Francis J. Flaherty & David Lauter, "Inside Agent Orange: The 11th–Hour Talks that Almost Failed," *Nat'l L.J.,* May 21, 1984, at 1; Ralph Blumenthal, "How Judge Helped Shape Agent Orange Pact," *N.Y. Times,* May 11, 1984, at A1.

Appellants mistakenly attempt to create an inference of impropriety out of our characterization of the $180 million settlement as "essentially a settlement at nuisance value." 818 F.2d at 171. Assuming the correctness of our characterization, it is in no way indicative of any improper collaboration between class representatives and the chemical company defendants. It was instead a reflection of the "formidable hurdles" plaintiffs faced. As we went on to conclude, plaintiffs' counsel "had good reason to view this case as having only nuisance value." *Id.*

Indeed, we note that, despite some intervening changes in the law, serious obstacles to recovery remain. Thus, although the scope of the government contract defense has been somewhat limited by the Supreme Court's decision in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 512, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988), under proper circumstances the defense is still available to government contractors. *See Lewis v. Babcock Indus., Inc.,* 985 F.2d 83 (2d Cir.1993); *Stout v. Borg–Warner Corp.,* 933 F.2d 331 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67 (3d Cir.1990). There is more than a mere possibility that such circumstances exist in the instant case. It is clear from the chemical companies' contracts with the Government that the Government specified Agent Orange's ingredients in great detail. There also is documentary evidence tending to show that the Government strictly prescribed the markings on Agent Orange barrels, and prohibited all extraneous label information, including warnings. Finally, there is evidence that the Government's knowledge of the hazards of Agent Orange and dioxin was at least as great as that of the chemical companies, making it unlikely that there were "dangers ... that were known to the supplier but not to the United States," of which the suppliers should have warned. *Boyle, supra,* 487 U.S. at 512, 108 S.Ct. at 2518. In sum, although the availability of the government contract defense might not be a foregone conclusion, there is a reasonable probability that it would apply, barring any recovery by the plaintiffs.

In addition, despite continuing research, the crucial issue of "general causation," i.e.,

whether any injuries are attributable to Agent Orange, remains unsettled. As one 1992 commentator noted, reviewing the scientific literature: "To date, there has been no conclusive evidence that exposure to Agent Orange is carcinogenic, mutagenic or teratogenic in humans. Furthermore, no deaths attributable solely to exposure to Agent Orange and its dioxin contaminant have been reported." 13B Arthur L. Frank, *Courtroom Medicine: Cancer,* § 25A.00, at 25A–4 (1992).

Indeed, it remains as difficult as ever to prove individual levels of exposure to Agent Orange. For instance, a 1990 study conducted under the auspices of the Environmental Protection Agency and the Veterans Administration compared Vietnam veterans to veterans not serving in Vietnam and civilian men, all of like age, and concluded that:

> with or without adjustment for several demographic variables, the mean level of [dioxin] in the adipose tissue of the 36 Vietnam veterans was not significantly different from that of the 79 non-Vietnam veterans or the 80 civilian men.... Furthermore, the results showed no association between [dioxin] levels and any estimate of Agent Orange exposure opportunity based on military records.... The study results suggest that heavy exposure to [dioxin] for most Vietnam veterans was unlikely and that available military unit records used in the study were inadequate in assessing exposure to Agent Orange for those Vietnam veterans.

Han K. Kang *et al., Dioxins and Dibenzofurans in Adipose Tissue of U.S. Vietnam Veterans and Controls,* at x (1990).

Even if appellants were to surmount the military contractor defense, provide satisfactory epidemiological evidence on the issue of general causation, and demonstrate with sufficient accuracy their levels of personal exposure to Agent Orange, they still would face the difficult task of demonstrating individual causation, i.e., that Agent Orange exposure caused the particular illnesses upon which they base their claims. Unlike asbestos, dioxin has not been recognized as the source of a distinctive medical illness.

The lesson to be drawn from this discussion is that the fundamental fairness of the *Agent Orange I* settlement remains unshaken. Notwithstanding the legal and scientific developments of the past nine years, the chances of recovery are nearly as speculative today as they were at the time of settlement. Appellants' challenges to the adequacy of their representation therefore must be rejected.

In so holding, we do not denigrate the importance of qualified and faithful class representation. The quality and fidelity of counsel are of paramount importance in class actions such as the instant one which involve unknown claimants. Indeed, we ordinarily would anticipate the appointment of a guardian to represent the interests of absent claimants, particularly those with questionable injuries. In the instant case, however, we are not writing on a clean slate. The unique circumstances surrounding *Agent Orange I*—in particular, the even-handed treatment of both identified and unidentified legitimate claimants in the *Agent Orange I* settlement and the dim prospects of success both then and now—rendered additional protections unnecessary. The representation in *Agent Orange I* was more than adequate to protect appellants' interests.

Once all of the foregoing issues are resolved in favor of appellees, resolution of the case is relatively straightforward. Both the Settlement Agreement, and the district court's judgment dismissing the cases, explicitly and permanently barred future actions by class members against the defendants:

> All complaints in this class action, and all claims of each and every plaintiff and member of the Rule 23(b)(3) class, are hereby dismissed on the merits, with prejudice....
>
> ....
>
> Each and every plaintiff and member of the Rule 23(b)(3) class is hereby forever barred from instituting or maintaining any action against any of the defendants ... arising out of or relating to, or in the future arising out of or relating to, the

subject matter of any of the complaints in this class action.

618 F.Supp. at 624.

> Defendants ... are not, and in the future shall not be, subject to liability or expense of any kind to any member of the Class in respect of any claim arising out of the subject matter of the Complaint.... Claims against the Fund shall be the exclusive remedy of all Class members against the defendants ... and all members of the Class are forever barred from instituting or maintaining any action against any of the defendants ... arising out of or relating to, or in the future arising out of or relating to, the subject matter of the Complaint.

Settlement Agreement ¶ 5, 597 F.Supp. at 864. Because appellants are properly within the *Agent Orange I* class, these provisions are binding on them, and their suits were properly dismissed. The *Agent Orange I* settlement mechanism constitutes appellants' sole source of relief.

We are not persuaded by appellants' argument that the $10 million indemnity provision for state law judgments evidences a different intent. When the Settlement Agreement is read in its entirety, it is apparent that the indemnity provision was intended to protect the defendants against claims by those plaintiffs who opted out of the class and could sue separately in state court.

Appellants' final argument, raised for the first time after the court's initial decision below, is that Judge Weinstein should have disqualified himself for conflict of interest or appearance of partiality. Appellants contend that Judge Weinstein is a "fiduciary" of AO-CAP, and thus has a conflict of interest requiring disqualification under 28 U.S.C. § 455(b)(4). In relevant part, section 455(b)(4) requires a judge to disqualify himself if "[h]e knows that he, individually or as a fiduciary, ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." The statute defines "fiduciary" as including "such relationships as executor, administrator, trustee, and guardian." 28 U.S.C. § 455(d)(3).

■ As principal support for their claim, appellants rely on *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). In *Liljeberg*, the Court held that disqualification was required because the trial judge was trustee of a college that stood to reap significant financial gains depending upon the outcome of the lawsuit. Appellants read *Liljeberg* too broadly. Although there are superficial similarities between *Liljeberg* and the instant case, there is one crucial difference. The fiduciary duty of the judge in *Liljeberg* was owed to a non-litigating entity, while Judge Weinstein's duty was part of his judicial obligation to litigating class members. A judge in a class action is obligated to protect the interests of absent class members. *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir.1987). Moreover, we specifically instructed Judge Weinstein to retain direct oversight of the Class Assistance Program fund. *See* 818 F.2d at 185–86. His legally-imposed duties *qua* judge with regard to the settlement funds are not a "fiduciary" obligation within the meaning of section 455(b)(4), and do not mandate disqualification from cases which may involve the fund. *See Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) ("[T]he courts, in interpreting a statute, have some 'scope for adopting a restricted ... meaning of its words where acceptance of [a literal] meaning would lead to absurd results....'" (quoting *Helvering v. Hammel*, 311 U.S. 504, 510, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941)).

■ In addition to basing their argument on section 455(b)(4), appellants allege that Judge Weinstein's "fiduciary" obligation violates section 455(a), which requires disqualification whenever a judge's "impartiality might reasonably be questioned." This argument likewise lacks merit. Whether a judge has an appearance of partiality is determined from the viewpoint of a reasonable observer with knowledge of all surrounding circumstances. *Liljeberg, supra*, 486 U.S. at 860–61, 108 S.Ct. at 2203. In the instant case, a reasonable observer would not question the district court's impartiality. In managing

AOCAP, Judge Weinstein is merely carrying out the supervisory duties assigned to him by the law of class actions in general, and by the orders of this court in particular.

Alternatively, appellants argue that Judge Weinstein has manifested an appearance of partiality mandating his disqualification under 28 U.S.C. § 455(a) based on his conduct in other cases. In essence, appellants accuse Judge Weinstein of possessing some traits of megalomania, of having a "systemic interest in retaining excessive judicial powers over mass tort cases," Br. at 49, in order to effect a "systematic denial of rights to toxic tort plaintiffs," Br. at 58, to "circumvent" various legal obstacles, Br. at 61, and to ensure that "other defendants ... make settlements by which enormous sums will be turned over to the custody of the court for discretionary allocation," Br. at 57. These allegations, verging on the slanderous, are patently ridiculous and an affront to both the district court and this court. Appellants overlook the fact that we affirmed in all significant respects Judge Weinstein's purported use of "excessive judicial powers" in *Agent Orange I.* Moreover, we recently commended Judge Weinstein for his "innovations" and "innovative managerial skills" in such large-scale litigation. *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 836 n. 1 (2d Cir. 1992).

Even if appellants' section 455 arguments had some indicia of merit, they were not raised in a timely fashion. "It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Medical Ctr.*, 829 F.2d 326, 333 (2d Cir.1987). Apparently recognizing the problem created by their delay, appellants contend on appeal that Judge Weinstein's lack of qualifications were hidden until revealed by his decision now being appealed. That argument is ridiculous. Judge Weinstein's highly-visible role in managing the *Agent Orange I* settlement and his active participation in other mass tort actions have been disclosed and discussed time and again in the media and in publicly-available documents and cannot have come as a surprise to

appellants. *See, e.g.,* Arnold H. Lubasch, "Jack Weinstein: Creative U.S. Judge Who Disdains Robe and High Bench," *N.Y. Times,* May 28, 1991, at B5; Francis J. Flaherty & David Lauter, "Judge's Novel Rulings Spurred Settlement," *Nat'l L.J.,* May 21, 1984, at 41; Ralph Blumenthal, "How Judge Helped Shape Agent Orange Pact," *N.Y. Times,* May 11, 1984, at A1.

In conclusion we summarize our holdings as follows: (1) the removal and transfer of these cases from Texas state court to the United States District Court for the Eastern District of New York was a proper exercise of federal judicial power under the All Writs Act, 28 U.S.C. § 1651, and the multidistrict litigation statute, 28 U.S.C. § 1407; (2) appellants are properly within the class certified in *Agent Orange I;* (3) as members of the *Agent Orange I* class, appellants are barred by the *Agent Orange I* judgment from instituting and maintaining the instant litigation, and the district court properly dismissed their claims; (4) Judge Weinstein's disqualification is not required.

The judgment of the district court is affirmed, and costs are awarded to appellees.