830 F.Supp. 686 (1993)
In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.
United States Bankruptcy Court, Southern District of New York.
In re JOHNS-MANVILLE CORPORATION, et al., Debtors.
Bernadine K. FINDLEY, as Executrix of the Estate of Hilliard Findley, et al., Plaintiffs,
v.
Donald M. BLINKEN, et al., Defendants.
United States District Court, Eastern District of New York and Southern District of New York.
Bankruptcy Nos. 82 B 11656(BRL) through 82 B 11676,
No. CV 90-3973.
United States District Court, E. & S.D. New York,
United States Bankruptcy Court, S.D. New York.
August 12, 1993.
Caplin & Drysdale, New York City by Elihu Inselbuch, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, San Francisco, CA by Harry F. Wartnick, Baron & Budd, Dallas, TX by Frederick M. Baron, for a subclass.
Hopkins & Sutter, Washington, DC by Murray Drabkin, Walter Umphrey, Alan Nisselson, for Cimino plaintiffs.
*687 Gertler, Gertler & Vincent, New Orleans, LA by M.H. Gertler, for New Orleans plaintiffs.
Cooney & Conway, Chicago, IL by Kevin J. Conway, Kathy Byrne, for Estate of Hugh Wilson.
Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Leslie Gordon Fagen, for future claimants.
Gillenwater, Nichol & Ames, Knoxville, TN by Paul T. Gillenwater, for Tennessee plaintiffs.
Patten, Wornom & Watkins, Newport News, VA by Robert R. Hatten, Glasser & Glasser, Norfolk, VA by Richard S. Glasser, Schoeman, Marsh & Updike, New York City by Michael E. Schoeman, for Virginia judgment creditors.
Davis, Polk & Wardwell, New York City by Lowell Gordon Harriss, for Manville Corp.
John H. Faricy, Jr., Minneapolis, MN, for MacArthur Co.
Debevoise & Plimpton, New York City by Anne E. Cohen, for Owens-Corning Fiberglass Co.
Steele & Sales, Seattle, WA by Katherine M. Steele, for E.J. Bartells Co.
Shea & Gardner, Washington, DC by Frederick C. Schafrick, for Center for Claims Resolution.
Hal Pitkow, Washington, DC, for Edward Venables, et al. as objecting parties.
David Austern, Gen. Counsel, Manville Personal Injury Settlement Trust, Washington, DC, for Manville Personal Injury Settlement Trust.
Donovan, Leisure, Newton & Irvine, New York City by James L. Stengel.
Peter G. Angelos by Timothy J. Hogan.
Levy, Phillips & Konigsberg by Stanley J. Levy.
Rose, Klein & Marias by Robert B. Steinberg.
Connerton, Ray & Simon by Shepard A. Hoffman.
Edward O. Moody.
Sterl F. Shinaberry.
Michael B. Serling.
Steven H. Wodka.
Brayton, Gisvold & Harley by Alan R. Brayton.
Paul, Reich & Myers by Robert Paul.
Joseph Rice.
Thomas W. Henderson.
McCarter & English by Andrew T. Berry.
Bill Ravanesi.
White Lung Ass'n by James Fite, Myles O'Malley, Paul L. Safchuck.

MEMORANDUM AND ORDER
WEINSTEIN, Senior District Judge, and BURTON R. LIFLAND, Chief Bankruptcy Judge.
The Manville Personal Injury Settlement Trust (the Trust), created to distribute funds to those injured by the asbestos-containing products of the former Johns-Manville corporation, is a limited fund. By any reasonable calculation, its former, current and projected assets will be far exceeded by the full value of past, present and future asbestos claims.
In order to determine the fairness of any settlement purporting to distribute this limited fund equitably and to exercise informed oversight of the administration of the Trust's assets, the courts must be reasonably confident of the likely volume and value of future claims. To assist in this connection, appointment of a panel of experts was authorized by the district courts for the Southern and Eastern Districts of New York under Rule 706 of the Federal Rules of Evidence. That expert panel has now reported. In the interests of prompt settlement and distribution of funds to the injured as soon as practicable, a determination of the probative value of the Rule 706 report and of the probable number and value of future claims is desirable. An evidentiary hearing for that purpose is required.

*688 I. FACTS

A. Origins of Present Litigation

This action originated with a bankruptcy proceeding initiated by the former Johns-Manville Corporation in 1982. The protections of the bankruptcy laws were sought in recognition of Johns-Manville's inability to remain solvent while paying settlements or judgments to the growing number of persons who were developing asbestos-related diseases. These injuries were caused by exposure to asbestos-related products manufactured by the debtor with knowledge of their dangers and without adequate warning to those exposed.
The reorganization plan that emerged from this bankruptcy proceeding was confirmed in 1986. See In re Johns-Manville Corp., 68 B.R. 618 (Bankr.S.D.N.Y.1986); In re Johns-Manville Corp., 66 B.R. 517 (Bankr.S.D.N.Y.1986). Appeals concluded in 1988. See Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.1988). To effectuate the reorganization plan, the Bankruptcy Court issued an injunction requiring all asbestos claimants with health claims against the Johns-Manville Corporation to proceed against the Trust, first by attempting settlement and then by opting for mediation or tort litigation. The Trust was funded with various assets of the debtor corporation and stock and profits of its successor, the Manville Corporation.
Even before its first payment, the Trust and plaintiffs' counsel were aware that the Trust would have troughs in funding. The clear insufficiency of Trust assets created a strong incentive for plaintiffs' attorneys to secure early settlements and judgments. The Trust's in-house operational costs and outside legal fees soon approached $100 million per year. Many settlements included provisions for deferred payment in unwarranted hopes that future profits of the Manville Corporation due to the Trust would be available to satisfy the Trust's obligations. By March of 1990, the Trust had received more than 150,000 asbestos claims, 50 percent more than the highest estimate at the time of the reorganization plan's approval. 22,386 of these claims had been settled at an average value of $42,000  far higher than was originally estimated. The Trust was effectively without funds to meet its current and short-term obligations.
On July 9, 1990, pursuant to their authority to withdraw a case in whole or in part from the Bankruptcy Court, the United States District Courts for the Eastern and Southern Districts of New York issued an order staying payments by the Trust of judgments, settlements and legal fees. On September 18, 1990 Marvin E. Frankel was appointed as a special master and directed to hold hearings and report on the financial condition of the Trust and on whether there existed a substantial probability that continued payment of damage awards would exhaust its assets. Special Master Frankel reported on November 3, 1990 that the Trust was "deeply insolvent," estimated that the value of claims would exceed projected assets by at least three times, and stated that the Trust lacked the cash required to pay the then liquidated total of $448.5 million in claims. Intensive negotiations under the courts' direction ensued for the creation of a revised Trust Distribution Process.
On November 19, 1990 plaintiffs filed, in the District Courts and the Bankruptcy Court, a limited-fund class action complaint against the trustees of the Trust seeking a revision of the payment procedures to promote equitable compensation of all Trust beneficiaries. Counsel submitted the same day a stipulation of settlement of that class action, including a revised Trust Distribution Process. On November 23, 1990, the courts conditionally certified the class; appointed representative counsel, including a representative of future claimants; set fairness hearings; approved a form of notice; and stayed all payments by the Trust and all proceedings against it. Notice of the class certification and copies of the courts' orders were provided to counsel for all known represented claimants, to 1,500 pro se claimants, to all courts in which the Trust was a party to litigation and to other interested persons, including publication in 11 major newspapers. Fairness hearings were held over eight days in four cities.

*689 B. Rule 706 Panel

Johns-Manville ceased manufacturing and supplying asbestos-related products in 1970. Asbestos-related diseases, however, have lengthy latency periods  some of forty years or more. New Johns-Manville-related cases continue to be filed at a current rate of between 10,000 and 12,000 per year. In view of the insolvent status of the Trust, no reasonable evaluation of the fairness of a proposed settlement of the class action could be made without a firm grasp of the likely number and value of future claims against the Trust. Beyond approval of a potential settlement, it would be impossible for the courts to monitor the ongoing administration of the Trust pursuant to that settlement without an understanding of how the income and the principal of the Trust should be allocated between payment of present beneficiaries and preservation and enhancement for the benefit of future beneficiaries.
On December 7, 1990, the district court appointed Professor Margaret E. Berger, pursuant to Rule 706 of the Federal Rules of Evidence, to consider the creation of a panel of experts to evaluate and predict the volume and type of future claims. The Rule 706 order stated in pertinent part:
1. Professor Margaret A. Berger ... is appointed as an expert pursuant to Rule 706 of the Federal Rules of Evidence....
2. Professor Berger is empowered and charged with reporting to the court
a. on the feasibility of providing accurate estimates of future claims upon the Trust,
b. on procedures for the collection and tabulation of relevant information with regard to claimants, and for the establishment and maintenance of a data base that will facilitate the estimation of future claims when Trust assets are sold.
3. In connection with the foregoing tasks, Professor Berger is empowered
a. to aid the court in selecting an appropriate panel of knowledgeable and neutral experts pursuant to Rule 706 of the Federal Rules of Evidence,
i. by soliciting recommendations from the parties as to knowledgeable and neutral experts who should be appointed to the panel;
b. to supervise, organize and co-ordinate the work of the panel after members of the panel are appointed by the court;
c. to act as a conduit between the parties and the panel, and the panel and the court,
i. by obtaining data from the parties relevant to the work of the panel,
ii. by soliciting the parties' views with regard to the work plan of the panel;
d. to undertake such further tasks with regard to estimating future claims as the court may direct.
In re Joint E. & S. Dists. Asbestos Litig., 122 B.R. 6, 7 (E. & S.D.N.Y.1990).
On January 22, 1991, Professor Berger testified at a fairness hearing that estimation of future claims would be difficult but that reasonably accurate estimates could be made. She submitted an "Interim Rule 706 Report" on April 1, 1991. See In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 926-31 (E. & S.D.N.Y.1991) ("Appendix B"). She began by stating,
In order to project the number of future persons who will make claims for asbestos related disease, two separate calculations must be made: 1) as to the incidence of various diseases that are attributable to asbestos exposure, and 2) as to the number of victims of each of these diseases who will make a claim for damages against the Trust.
With respect to the first point, she recognized the established causal connection between asbestos and mesothelioma, lung cancer, pleural diseases and other ailments. Nonetheless, she said, "calculating the future incidence of asbestos disease is a task filled with uncertainties." Several factors were identified as contributing to these uncertainties: incomplete understanding of asbestos-related diseases; scarcity of data about actual exposure; lack of confidence in the ability to calculate other diseases as a percentage of *690 mesothelioma cases; underdiagnosis and difficulty of diagnosis of asbestos-related diseases; interaction of other hazardous substances including tobacco; and the unsettled question of the degree to which different types of asbestos fibers affect disease rates.
As to the incidence of claimants, Professor Berger named numerous variables affecting the likelihood of a person filing a claim: publicity about the availability of a claims mechanism; the amount of money available to pay claims; the value ascribed to particular diseases; the economic climate; the degree of proof required; and the persistence with which lawyers or labor unions encourage and pursue claims. A problem of circularity also would be likely since the efficient functioning of the Trust and the volume and pace of claims are largely dependent upon each other.
Despite these many problems requiring careful treatment, Professor Berger concluded, "After speaking to numerous experts in a variety of disciplines, and reading reports of projections made at the time of the Manville bankruptcy, I am persuaded that [a projection of future claims] is practical because a useful product would result." She consulted with experts in the fields of epidemiology, mathematics, biostatistics, general medicine, pulmonology and economics, many of whom had prior experience with asbestos projections. "The group of experts agreed that while it is impossible to arrive at the correct number of future claims, it is possible to develop models for projecting plausible ranges of disease incidence and for estimating the incidence of claims."
Professor Berger stated her opinion that projections would both increase the planning capabilities of the Trust in managing its assets and promote the parity provisions in the then existing settlement agreement that proposed pro rata treatment for present and future beneficiaries. She noted the importance of an independent analysis, in view of a history of inaccurate partisan projections throughout asbestos litigation, and the benefits of such a court-sponsored independent analysis to the general public.
Professor Berger recommended the appointment of Dr. Kenneth G. Manton of Duke University, a neutral and widely respected expert who already had made considerable progress in projecting incidence of asbestos-related diseases, to undertake the projections. He has been assisted by Eric Stallard, Associate Research Professor at Duke University. Professor Berger suggested that Dr. Joel E. Cohen of Rockefeller University be appointed to assist in Dr. Manton's work and that a panel of eminent scientists in a variety of fields later be assembled to advise Dr. Manton and evaluate his study. Dr. Alan M. Ducatman, Professor of Medicine and Director of the Institute of Occupational and Environmental Health at the West Virginia School of Medicine, and Dr. Burton H. Singer, of the Yale School of Medicine, subsequently have participated in the panel's work.
After conferring with interested parties and holding a public hearing on Professor Berger's report, the courts, on April 22, 1991, adopted the Interim Rule 706 Report in its entirety and directed the Trust to make funds available for the necessary studies. The courts recognized that all parties asserting interests in the Trust's funds had strong and potentially conflicting interests in any estimate of numbers of future cases and that an independent analysis was essential. They stated,
In this proceeding, the courts must consider divergent and contingent interests of those who may seek compensation from the Trust estimated to range in the hundreds of thousands. This fundamental concern warrants independent expert review of opinions upon which the success of the Settlement rests....
The history of the Johns-Manville bankruptcy demonstrates the need for projections made by persons who are not associated with the litigants. An independent study is not susceptible to attack on the basis of bias, a charge leveled against some of the projections previously made.... A study made at the direction of the courts will become part of the public record. Its assumptions and conclusions will be publicly aired and subject to peer review by the scientific community. The consequences of asbestos use is an issue about which the *691 public and our policy-makers need to be informed; the Trust is a quasi-public entity.
In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 764 (E. & S.D.N.Y.1991).
There have been ongoing meetings among representatives of the Trust and its own independent expert consultants, Dr. Manton, Mr. Stallard, Dr. Cohen, Dr. Ducatman, Dr. Singer, Professor Berger and Mark Peterson of the Rand Corporation to modify and correct the methodology being utilized in providing the necessary estimate. The Trust has provided updated materials on new and old claims in a fully cooperative effort.

C. Present Posture of Case

Some parties persisted in their objection to a study of future claims pursuant to Rule 706 and requested from the court of appeals a writ of mandamus blocking the independent expert analysis. The court of appeals declined to address the question immediately, choosing instead to consider the challenge to the Rule 706 appointment as part of the overall appeal from the settlement of the class action.
On June 27, 1991 the courts issued an amended memorandum, order and final judgment. It approved the settlement, made permanent the prior stay of proceedings against the Trust and reaffirmed the prior injunction issued by the Bankruptcy Court restricting suits against the Manville Corporation. The settlement established a complex Trust Distribution Process intended to ensure solvency of the Trust and equitable distribution of its assets, including the division of asbestos health claimants into serious and less serious conditions and a procedure for channelling claims out of the courts.
The appeal from this settlement was argued in the court of appeals on February 24, 1992. On December 4, 1992 the court of appeals issued an opinion vacating the settlement and remanding the case for further proceedings. In re Joint E. & S. Dists. Asbestos Litig., 982 F.2d 721 (2d Cir.1992). The court's chief objection was that subclasses were not created to represent the interests of the various categories of claimants against the Trust. Id. at 734-45. The court of appeals issued a second opinion in May 1993 clarifying its first by stating that the court did not intend to hold that separate subclasses are required to represent those at the front and the back of the Trust's first-in-first-out (FIFO) processing queue. In re Findley, 993 F.2d 7 (2d Cir.1993).
While the court of appeals vacated the class action settlement, its first opinion denied the petition for mandamus and affirmed the Rule 706 appointment. The court first noted that the Rule 706 order was entered in both a class action and a bankruptcy context. It stated,
Wholly apart from the authority of the District Court to appoint Rule 706 experts in connection with determining the fairness of the Settlement of the class action, we have no doubt of the Court's authority to exercise its bankruptcy court powers to appoint experts to advise it on matters that concern the ongoing administration of the Chapter 11 proceeding. Thus, we need not pause to consider the objectors' contentions that the April 22 order is invalid as allegedly in conflict with the mechanism contemplated by the Settlement for estimation of future claims and resolution by arbitration of any allocation disagreements between the present claimants and the Trustees.
In re Joint E. & S. Dists. Asbestos Litig., 982 F.2d at 750. The court explained that the reorganization plan explicitly provided for court supervision that would include the use of a Rule 706 expert, including "[t]o determine any and all disputes arising under the Plan, the Trust Agreement ... and the Settlement Agreements," "[t]o enforce and administer provisions of the Plan," and "[t]o enter such orders as may be necessary or appropriate ... to facilitate implementation of the Plan." Id. The court continued,
The Trust is not an ordinary private undertaking of a settlor to carry out private preferences. It is the mechanism established under the auspices of the Bankruptcy Court to implement a plan of reorganization. The Bankruptcy Court has continuing responsibilities to satisfy itself that the Plan is being properly implemented. *692 Toward that end, it is fully entitled to avail itself of expert advice on the difficult matter of estimating future claims against the Trust. Whether or not the rendering of advice by such experts would encroach on the fiduciary responsibilities of trustees of a purely private trust, a matter we need not decide, such advice entails no legally cognizable impairment of the role of trustees of the Manville Personal Injury Settlement Trust. And we have no doubt that the role of the experts is within the broad authority of Rule 706.
Id.
On May 27, 1993 the courts received the mandate from the court of appeals. A hearing was held on June 8 for reports on the status of the litigation and the setting of a schedule for further proceedings. Temporary stays of all state and federal actions against the Trust were extended until August 31, 1993. The courts urged the parties once again to expedite payments. Status conferences were scheduled for July 20, August 12 and September 8 for reports on the progress of renewed settlement negotiations and for the setting of motion schedules and trial dates as might be required.
Negotiations among all the parties ensued. In July, two groups of Texas and Virginia judgment creditors reached agreements with the Trust for discounted payments of amounts owing to them. On July 22, 1993 the courts issued orders approving the agreements for discounted payments to the Virginia and Texas groups and directing the Trust to offer the same approximately 25 percent discount to all claimants who secured judgments against or settlements with the Trust prior to November 19, 1990  the date of the filing of the mandatory class action. These orders were appealed immediately. The court of appeals granted a temporary stay and referred the matter to a panel sitting on August 10, 1993 for consideration of whether these payments should be stayed to permit a full appeal. The matter was argued on August 10. On August 11 the court of appeals granted a stay and set argument on an expedited appeal for the week of September 7, 1993. See Order, Findley v. Blinken, No. 93-5070 (2d Cir. Aug. 11, 1993).

D. Rule 706 Report

On August 11, 1993 the courts received the draft report of the Rule 706 panel. Co-authored by Mr. Stallard and Dr. Manton, it is titled, "Estimates and Projections of Asbestos-Related Diseases and Exposures among Manville Personal Injury Settlement Trust Claimants, 1990-2049." The report will be referred to as "Future Claims." Its extensive findings, analysis and conclusions run to some 70 pages. It includes hundreds of additional pages of calculations, charts, graphs and tables.
The courts must now determine what action is appropriate in light of the delivery of the draft report.

II. LAW
Rule 706(a) of the Federal Rules of Evidence states in part,
The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.
Even before the adoption of this rule, the Court of Appeals for the Second Circuit recognized the importance and historical role of court-appointed experts:
Appellate courts no longer question the inherent power of a trial court to appoint an expert under proper circumstances, to aid it in the just disposition of a case.... [T]he appointment of an impartial ... expert by the court in the exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair trial of a lawsuit. It is now well accepted that the trial judge is not a mere umpire at the trial; indeed, there may be circumstances in which he would have a duty to seek impartial assistance in order to enlighten the jury and himself on issues which have become confused because of partisanship in presentation.
Scott v. Spanjer Bros., Inc., 298 F.2d 928, 930-31 (2d Cir.1962).
*693 The enlistment of court-appointed expert assistance under Rule 706 is not commonplace. See Fed.R.Evid. 706, Advisory Comm. Note ("experience indicates that actual appointment is a relatively infrequent occurrence"). The power, however, is recognized. See, e.g., United States v. Green, 544 F.2d 138, 145 (3d Cir.1976) ("inherent power of a trial judge to appoint an expert of his own choosing is clear" in determination of competency of defendant to stand trial), cert. denied, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977); Handschu v. Special Svcs. Div., 1989 WL 82397, 1989 U.S. Dist. LEXIS 8267 (S.D.N.Y. July 21, 1989) (Rule 706 expert appointed after class action settlement to evaluate adequacy of a document filing system); United States v. Michigan, 680 F.Supp. 928, 984-88 (W.D.Mich.1987) (Rule 706 psychiatric expert appointed to study and report on defendants' efforts to comply with consent judgment on mental health services in state prisons).
Courts are less assertive than they might be in enlisting the help of neutral experts. A recent survey of trial judges conducted through the Federal Judicial Center revealed that use of court-appointed experts under Rule 706 is relatively infrequent and that most judges "view the appointment of an expert as an extraordinary activity that is appropriate only in rare instances." Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 4-5 (Fed.Jud.Center 1993). Despite this reluctance, the authors of the study found that judges who did appoint experts "were almost unanimous in expressing their satisfaction" and "indicated that the appointed experts provided a highly valued service." Id. at 79. While acknowledging that use of Rule 706 should be reserved for exceptional cases in which the ordinary adversary process does not suffice, the authors concluded that "Rule 706 remains an important alternative source of authority to deal with some of the most demanding evidentiary issues that arise in federal courts." Id. at 95.
The work of such experts is especially critical in dealing with complex mass tort problems such as the instant case. The dilemma presented here is typical of these exceptional cases: the epidemiological and other scientific questions are complex and riven with uncertainties and interdependent variables; the number of persons affected runs into the hundreds of thousands; the courts cannot proceed toward a just and equitable result without some reasonably firm data projecting the numbers and volume of claims at issue; and all parties have strong and conflicting interests in the character of that data. These factors, alone and in combination, point to the necessity of neutral, expert assistance under the auspices of the court.
As the court of appeals explained in affirming the Rule 706 appointment in this case, the obligations of a court supervising a complex bankruptcy reorganization involving a large trust mechanism created consensually for the benefit of certain classes of creditors cannot be met without the oversight court having a solid grounding in fact. In re Joint E. & S. Dists. Asbestos Litig., 982 F.2d 721, 750 (2d Cir.1992). While the court of appeals focused here on the courts' bankruptcy functions and declined to consider the class action context, Rule 706 expert assistance can be as important to a court's evaluation of the fairness of a class action settlement as to its evaluation of the propriety of management of a bankruptcy reorganization mechanism such as the Trust. See Fed.R.Civ.P. 23(e) ("[a] class action shall not be dismissed or compromised without the approval of the court"). And the court's obligations in the class action context extend well beyond determination of the fairness of a settlement to include such matters as supervision of the settlement's equitable implementation. See, e.g., Ivy v. Diamond Shamrock Chems. Co., 996 F.2d 1425 (2d Cir.1993) (affirming actions of district court in exercise of its continuing authority over complex mass tort class action after settlement); Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978) ("[I]t [is] incumbent upon the district court to exercise its broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members more equitably."); Zients v. LaMorte, 459 F.2d 628, 630 (2d Cir.1972) ("Until the fund created by the settlement is actually distributed, *694 the court retains its traditional equity powers.").
As the Court of Appeals for the First Circuit has explained, Rule 706 does not "subsume the judiciary's inherent power to appoint technical advisors," but when an appointment is made pursuant to Rule 706, it must be considered an appointment of an expert witness subject to the restrictions imposed by Rule 706. Reilly v. United States, 863 F.2d 149, 155-56 (1st Cir.1988). A mere technical advisor "is called upon to make no findings and to supply no evidence" so that "provisions for depositions, cross-questioning, and the like are inapposite." Id. at 156. A Rule 706 expert witness, however, presents testimonial, documentary and other evidence and is subject to the requirements of advance notice and opportunity for testing that apply to all evidence in civil cases. Rule 706 provides,
A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.
All parties are entitled to be notified of the court's intention to utilize such an expert and must be provided with some opportunity to review the expert's qualifications and work in advance.

III. APPLICATION OF LAW TO FACT
Before the courts can take action based upon the report of Dr. Manton and the other Rule 706 experts, the parties must be afforded the opportunity to evaluate the report and test its validity. Time remains of the essence to this case. Hundreds of thousands of people are waiting for payment. Reliable data is necessary before the courts can act, but action must be taken promptly in order that funds are distributed to those injured.
Approximately one month will be provided during which the parties will be permitted to study and evaluate the Rule 706 report. Members of the Rule 706 panel will themselves continue to critique Dr. Manton's initial report and he may supplement and revise it. Revisions of the Rule 706 report shall be furnished promptly to the courts and made immediately available to the parties by the Trust.
After the one-month evaluation period has concluded, the courts will hold a hearing. The authors of the Rule 706 report will be asked to present their report in the form of sworn testimony. They may be cross-examined. The parties may present their own testimony and exhibits relevant to the question of estimating numbers and volume of future asbestos claims.

IV. HEARING
All parties on the service list will exchange names of witnesses, their backgrounds, their proposed testimony in detail and copies of any exhibits proposed to be introduced. This exchange shall be completed by September 10, 1993. The hearing will be before Judge Weinstein and Chief Judge Lifland in courtroom 10, Federal Courthouse, Brooklyn, New York, Tuesday, September 28, 1993 at 11:00 a.m.
The Trust shall provide copies of the Rule 706 report to all persons on the service list. Three copies shall be made available in the clerk's office, Eastern District of New York, Brooklyn, New York for those not on the service list. Those not on the service list who do not notify the court and Trust by September 10, 1993 that they wish to be heard on September 28 will be heard orally for up to ten minutes each and may submit written materials at the hearing.
SO ORDERED.